**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **GLADIS CALLWOOD, as** | ) |
| **Administratrix of the Estate of** | ) |
| **KHARI NEVILLE ILLIDGE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO.:  2:15-CV-182-WHA** |
| | ) |
| **PHENIX CITY, ALABAMA, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**<u>DEFENDANTS JONES, JENKINS, MILLS, AND R. SMITH'S
MEMORANDUM BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT</u>**

COME NOW Defendants Jay Jones, Charles Jenkins, Jr., Steven M. Mills, and Ray

Smith and move this Court to grant them summary judgment pursuant to Federal Rule of Civil

Procedure 56.  As grounds therefore, Defendants submit the following:

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...................................................................................................................2

STATEMENT OF FACTS .....................................................................................................5

STANDARD OF REVIEW ...................................................................................................35

SUMMARY OF REMAINING CLAIMS ............................................................................37

ARGUMENT ........................................................................................................................38

CONCLUSION......................................................................................................................64

## INTRODUCTION

On March 24, 2013, Khari Illidge was a danger to himself and to everyone he came into contact with.  Fueled by an unknown hallucinogenic, he swept his friend, Nicholas Woodham; Woodham's parents, Norman and Leigh Ann Woodham; Lee County residents George Irvin, Gabriel Irvin, Victoria Dawn Shelley, Dr. William Warr, and Gloria Warr; Lee County Sheriff Deputies Steven Mills, Ray Smith, and Charles Jenkins; and Phenix City officers David Butler, Shawn Sheely, and Joey Williams into his realm of chaos.

Illidge's friend, Nicholas Woodham, saw him take "three and a half hits" of a substance purported to be LSD.  Shortly thereafter, Illidge's demeanor changed.  He began "beading with sweat" and acting paranoid. He stripped off all of his clothes and began pacing in the yard. When Nicholas tried to grab him and intervene, Illidge tossed him aside "like a rag doll." Nicholas sought help from his father, Norman Woodham. Norman saw Illidge next to the wood line. Illidge's eyes were glazed, and upon seeing them, Norman knew that he should not confront Illidge. Illidge then took off running, naked, into the woods.

Approximately an hour later, Illidge emerged from the woods, covered in scratches and abrasions, as if he ran through briars. He then abruptly entered the home of George Irvin. Victoria Dawn Shelley was in the house along with George Irvin, Gabriel Irvin, and three young children. After Shelley asked if she could help him, Illidge just as abruptly exited. George and Gabriel Irvin pursued him outside and saw Illidge sitting and staring at a spot light. Gabriel was armed with a pistol and George with a bat. Illidge approached Gabriel and he pulled the trigger, but the pistol misfired. Illidge then turned towards George who threatened to hit him with the bat. At some point in this confrontation, Illidge returned to the door and slammed himself against it with such force that it pushed Shelley backwards, who had just moments before locked it and

2

was holding it.  This portion of the altercation is captured on a 911 call.  Gabriel, who is now armed with a shotgun, orders Illidge to stop and get on the ground to which Illidge shouts "Just kill me now!"  If George Irvin had not been in the line of fire, Gabriel would have shot Illidge.  Illidge then left the Irvins' residence headed towards Lee County Road 308.

Deputy Steven Mills spotted Illidge walking naked down Lee County Road 308. Much of this interaction is captured on video. Illidge appeared to ignore that Mills is a deputy sheriff and continued to walk purposely past Mills, as if was walking to a particular location. Mills asked multiple times, "What's going on? What's wrong?" Illidge then walked into traffic and then went down a driveway for 1920 Pierce Road. All the time, Mills was trying to get him to stop. Mills then got out of his car and followed Illidge, who had hopped a fence. Suddenly Illidge stopped and turned towards Mills. He entered the zone of safety, and Mills then fired his Taser, from about three to five feet away. The Taser had no effect. Illidge grunted, pulled out a probe, and walked past Mills towards the residence. Mills then placed the Taser to Illidge's side, completing the circuit, and Illidge fell to the ground. Mills then tried to pin Illidge, but Illidge violently resisted and a struggle, which Mills described as fighting for his life, ensued. Illidge showed super-human strength and tossed Mills ten feet. Illidge then walked away across several fences and a horse pasture towards 1866 Pierce Road. An exhausted Mills called for assistance. Mills was alone during this confrontation.

Mills continued his pursuit on foot and was joined by Deputy Ray Smith. They followed Illidge to the rear of the residence at 1866 Pierce Road and were joined by Phenix City Officer David Butler. Illidge attempted to enter the residence's rear door. Gloria Warr, who lived there, heard Illidge attempt to enter. She saw him standing naked at her door. She retrieved her pistol and stood guard. When Illidge could not gain entry, he stated, "I almost made it." He then

aggressively turned towards the law enforcement officers. Smith then fired the Taser. Illidge fell

to the patio, and Mills and Butler rushed to handcuff him. Illidge continued to violently resist to

the point that he was able to carry the deputies and officers approximately 20 feet, up steps and

into a garden area. Smith activated the Taser several times, but if it made contact, it had little to

no effect on Illidge. Smith put down the Taser and had to assist the officers in cuffing him. At

that point, Illidge was never tased again. During the struggle, an ambulance was called. On the

recording of Phenix City's radio traffic, Illidge is clearly heard screaming incoherently.

Illidge exhibited incredible, unnatural strength.   Mills had to withdraw from the

confrontation because he was completely exhausted and was replaced by a Phenix City Sergeant

Joey Williams, who had arrived at the scene.  Eventually Illidge was handcuffed.  Other officers

arrived including, Phenix City officers Shawn Sheely and Lee County Deputy Charles Jenkins.

Illidge was held to the ground, but his breathing was not restricted.

Despite being handcuffed, Illidge continued to resist by kicking the officers. Officers held

his legs to no avail. Lee County Deputy Charles Jenkins arrived with legs irons, after a struggle,

the legs irons were secured; flex cuffs were then loosely connected between the leg irons and

handcuffs to stop Illidge from kicking.

Suddenly, Illidge became unresponsive and was found not to be breathing. This incident

occurred approximately 23 minutes after the last time that he was tased. Although it had been

earlier called, the ambulance had not arrived at this scene because it went to 1920 Pierce Road

where Corporal Mills, Deputy Smith, and Officer Butler had parked their vehicles with the blue

lights flashing. Although exhausted from the melee, the deputies and officers performed CPR on

Illidge until ambulance personnel arrived and took over. Despite their efforts, Illidge died.

Ironically, the Defendants are being blamed for Illidge's death. While the citizens, who

4

confronted Illidge, threatened him with deadly force, law enforcement declined to use it – because they were trying to protect Illidge from himself and from the community. No one could help him until he was secured. Illidge had become a violent force by ingesting a deadly substance that put him on the path of destruction. This case cries for dismissal – not only because Defendants Jay Jones, Charles Jenkins, Jr., Steven M. Mills, and Ray Smith are entitled to qualified immunity but also because they did nothing wrong.

## STATEMENT OF THE FACTS

1.      Late Sunday morning, the decedent, Khari Illidge, calls his friend Nicholas Woodham for a ride from a friend's house to Illidge's mother's house.  (Ex. H, Nicholas Woodham Dec. ¶¶ 2-3.)

2.      Nicholas picks up Illidge and sees that he obviously had a late night. (Ex. H, Nicholas Woodham Dec. ¶¶ 5-6.)

3.      Illidge is unusually quiet during the drive home, but Nicholas figures that Illidge is just suffering from a hangover. (Ex. H, Nicholas Woodham Dec. ¶¶ 5-6.)

4.      At his mother's house, Illidge showers, changes his clothes, and then he and Nicholas leave to pick up some beer.  (Ex. H, Nicholas Woodham Dec. ¶¶ 4, 7.)

5.      After picking up beer, Nicholas and Illidge stop at a restaurant, drink a beer, and eventually arrive at Nicholas's house at approximately 5:00 p.m.  (Ex. H, Nicholas Woodham Dec. ¶¶ 7-9; Ex. AA.)[1]

6.      During the drive, Nicholas believes that Illidge is acting "pretty strange."  (Ex. H, Nicholas Woodham Dec. ¶ 11.)

7.      Once at Nicholas's house, they hang out for a while, sit on the porch, and drink

_____

[1] Defendants' Exhibit AA contains a Google Earth image with the locations of the various encounters with Illidge marked.

some beers.  (Ex. H, Nicholas Woodham Dec. ¶¶ 10-12.)

8.    Still noticing that Illidge is not acting like himself, Nicholas asks him what is going on with him.  (Ex. H, Nicholas Woodham Dec. ¶ 12.)

9.    Illidge tells Nicholas that he took LSD the previous night and had also taken some earlier that day.  (Ex. H, Nicholas Woodham Dec. ¶ 13.)

10.   Illidge shows the LSD to Nicholas, which is on a small white strip of paper divided into approximately three and one-half doses.  (Ex. H, Nicholas Woodham Dec. ¶ 14.) [2]

11.   Illidge then takes all three and one-half doses in front of Nicholas.  (Ex. H, Nicholas Woodham Dec. ¶ 17.)

**The Drug's Adverse Effect on Illidge**

12.   Sometime thereafter, Nicholas notices that Illidge's demeanor begins to escalate. (Ex. H, Nicholas Woodham Dec. ¶ 18.)

13.   As they talk on the front porch, Illidge says that he is getting hot, and Nicholas sees Illidge's face begin beading with sweat.  (Ex. H, Nicholas Woodham Dec. ¶ 19.)

14.   Illidge becomes very anxious, cannot sit still, and begins pacing.  (Ex. H, Nicholas Woodham Dec. ¶¶ 20-21.)

15.   Illidge tells Nicholas that he has to go.  (Ex. H, Nicholas Woodham Dec. ¶ 21.)

16.   Nicholas replies that he will take Illidge anywhere he needs to go.  (Ex. H, Nicholas Woodham Dec. ¶ 22.)

---

[2] Nicholas does not know whether the substance actually was LSD; he merely knows that Illidge identified it as LSD. Toxicology reports did not reveal LSD in Illidge's system. (Ex. KK Verified Expert Report of Dr. Stacey Hail - Pg 17; Ex. HH, Toxicology Report.) Toxicologist Stacey Hail explains that the negative finding of LSD or any other hallucinogenic substance is common because the compounds change so quickly by those who produce it that the labs cannot stay current with changes. (Ex. KK Verified Expert Report of Dr. Stacey Hail - Pgs 17-19.)

17.     Illidge replies, "I don't think you understand.  I need to go!"  (Ex. H, Nicholas Woodham Dec. ¶ 23.)

18.     Illidge then runs into the yard, strips off all of his clothes, and begins walking. (Ex. H, Nicholas Woodham Dec. ¶ 24.)

19.     Nicholas attempts to talk to Illidge, but he does not respond.  (Ex. H, Nicholas Woodham Dec. ¶ 25.)

20.     When Illidge looks at Nicholas it seems as though Illidge is looking through him rather than actually seeing him.  (Ex. H, Nicholas Woodham Dec. ¶ 27.)

21.     When Nicholas approaches Illidge, he becomes angry and defensive.  (Ex. H, Nicholas Woodham Dec. ¶ 26.)

22.     Illidge begins walking off into a field toward Nicholas' parents' home.  (Ex. H, Nicholas Woodham Dec. ¶ 28.)

23.     Nicholas grabs hold of Illidge to stop him from walking off.  (Ex. H, Nicholas Woodham Dec. ¶ 29.)

24.     Khari picks up Nicholas, who weighs 205 pounds, off of his feet and throws him "like a ragdoll."  (Ex. H, Nicholas Woodham Dec. ¶ 29-31.)

25.     Nicholas immediately knows that he cannot control Illidge on his own and rushes to his parents' house for help.  (Ex. H, Nicholas Woodham Dec. ¶¶ 32-33, Ex. AA.)

**Nicholas Woodham Runs for Help**

26.     At approximately 6:15 p.m., Nicholas Woodham arrives at the home of his parents, Norman and Leigh Ann Woodham, where he asks his father, who is working in the front yard, to help him with Illidge.  (Ex. H, Nicholas Woodham Dec. ¶ 33; Ex. I, Norman Woodham

Aff. ¶ 4.) [3]

27.     Nicholas tells Norman that Illidge has taken a hallucinogenic drug, stripped off his clothing, and run into the woods.  (Ex. H, Nicholas Woodham Dec. ¶ 33; Ex. I, Norman Woodham Aff. ¶ 4.)

28.     Norman and Nicholas hurry back to Nicholas's house.  (Ex. H, Nicholas Woodham Dec. ¶ 35; Ex. I, Norman Woodham Aff. ¶ 4.) [4]

29.     When they arrive at Nicholas's house, Illidge is standing near the edge of the woods about twenty-five yards away.  (Ex. H, Nicholas Woodham Dec. ¶ 36; Ex. I, Norman Woodham Aff. ¶ 4.)

30.     Nicholas and Norman hope to calm Illidge down and get him back into Nicholas's house.  (Ex. H, Nicholas Woodham Dec. ¶ 36; Ex. I, Norman Woodham Aff. ¶ 4.)

31.     Nicholas and Norman attempt to get Illidge to sit and calm down, but he will not listen or comply with their requests.  (Ex. H, Nicholas Woodham Dec. ¶ 36.)

32.     When Norman calls out to him, Illidge does not appear to recognize his own name.  (Ex. I, Norman Woodham Aff. ¶ 4.)

33.     When Illidge looks at Nicholas and Norman, it is as though he is looking through them.  (Ex. H, Nicholas Woodham Dec. ¶ 37.)

34.     Illidge's eyes look "glazed and completely white."  (Ex. I, Norman Woodham Aff. ¶ 4.)

35.     At that point, Norman believes that they should not attempt to confront Illidge. (Ex. I, Norman Woodham Aff. ¶ 4.)

---

[3] Ex. I, Norman Woodham had met Illidge previously. (Ex. I, Norman Woodham Aff. ¶ 3.)

[4] Nicholas Woodham's house was adjacent to his parents' home.

36.     Illidge then runs away, across the road, and into the woods.  (Ex. H, Nicholas Woodham Dec. ¶ 38; Ex. I, Norman Woodham Aff. ¶ 4.)

37.     Norman and Nicholas return to Norman and Leigh Ann's home.  (Ex. I, Norman Woodham Aff. ¶ 4.)

38.     Leigh Ann Woodham is returning home from errands when she sees a naked man running down Lee County Road 314 and into the woods. (Ex. J, Leigh Ann Woodham Aff. ¶ 4; Ex. H, Nicholas Woodham Dec. ¶ 39.)

39.     Upon arriving home, Leigh Ann tells Norman and Nicholas, and they inform her that she saw Illidge[5] and that he had taken something that caused him to strip off his clothes and act crazy.  (Ex. I, Norman Woodham Aff. ¶ 5; Ex. J, Leigh Ann Woodham Aff. ¶ 4.)

40.     Leigh Ann calls 911 and reports the incident.  (Ex. J, Leigh Ann Woodham Aff. ¶ 4; Ex. I, Norman Woodham Aff. ¶ 5; Ex. H, Nicholas Woodham Dec. ¶ 40; Ex. OO, Log of Lee County Sheriff's Office CAD Reports; Exhibit PP, Log of Phenix City Police Department CAD Reports; Ex. UU, 2013-03-24_18_44_11.)

41.     At approximately 6:45 p.m., Lee County Deputy Sheriff Steven Mills and Deputy Sheriff Ray Smith, who are patrolling in separate police cruisers, receive a call from dispatch concerning a report of a naked black male running down Lee County Road 314.  (Ex. A, Mills Aff. ¶¶ 1-2; Ex. B, Smith Aff. ¶ 3.)

42.     Deputies Mills and Smith patrol the area but are unable to find anyone matching the description.  (Ex. A, Mills Aff. ¶¶ 1-2; Ex. B, Smith Aff. ¶ 3.)

### Illidge Enters the Irvin's Phenix City Residence

43.     Between 7:30 and 8:00 p.m., George Irvin, his son Gabriel Irvin, and Victoria

---

[5] Leigh Ann Woodham had met Illidge previously. (Ex. J, Leigh Ann Woodham Aff. ¶ 3.)

Shelley are at the Irvin's Phenix City home.  (Ex. O, Shelley Dec. ¶¶ 2-3; Ex. M, George Irvin Dec. ¶¶ 2-3; Ex. K, Gabriel Irvin Dec. ¶¶ 2-3.)

44.    Victoria's two-year-old son and Gabriel's seven and eight-year-old sons are also in the home. (Ex. O, Shelley Dec. ¶ 3; Ex. M, George Irvin Dec. ¶ 3; Ex. K, Gabriel Irvin Dec. ¶ 3.)

45.    Victoria is upstairs when she hears the back door open.  (Ex. O, Shelley Dec. ¶ 3.)

46.    As she comes down the stairs, Victoria sees Illidge standing naked in the foyer of the home, approximately two steps inside the door. (Ex. O, Shelley Dec. ¶ 3; Ex. X, Photo of Interior of Irvin Home.)

47.    Stunned, Victoria says, "Can I help you?"  (Ex. O, Shelley Dec. ¶ 3.)

48.    George and Gabriel, who are in other parts of the home, hear Victoria scream. (Ex. M, George Irvin Dec. ¶ 3; Ex. K, Gabriel Irvin Dec. ¶ 3.)

49.    Illidge looks at Victoria and leaves the house before George and Gabriel get to her.  (Ex. O, Shelley Dec. ¶ 3; Ex. M, George Irvin Dec. ¶ 3; Ex. K, Gabriel Irvin Dec. ¶ 3.)

50.    Victoria tells Gabriel and George what happened, and they go outside to investigate.  (Ex. O, Shelley Dec. ¶ 3 Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4.)

51.    Victoria locks the door.  (Ex. O, Shelley Dec. ¶ 4.)

52.    George arms himself with a baseball bat, and Gabriel retrieves a pistol from his truck.  (Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4.)

53.    Gabriel fires a shot into the air and shouts, "We know you're here!  You better come out now!"  (Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4.)

54.    Gabriel and George walk around the home and find Illidge sitting on the ground

under a spotlight.  (Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4, Ex. Z, Photo of Irvin Home Exterior.)

55.     Illidge is naked, covered in scratches, and bleeding.  (Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4.)

56.     Gabriel points his pistol at Illidge and tells him to stay seated.  (Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4.)

57.     George then goes to the porch and calls 911.  (Ex. M, George Irvin Dec. ¶ 4; Ex. K, Gabriel Irvin Dec. ¶ 4.)

58.     Illidge's speech is mostly incoherent, but Gabriel hears him say, "I don't ever sit down."  (Ex. K, Gabriel Irvin Dec. ¶ 4.)

59.     Illidge stands up and begins walking towards Gabriel.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

60.     Illidge's eyes look wild and glassy.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

61.     Gabriel holds his pistol on Illidge and keeps telling him to stay back.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

62.     Unaffected, Illidge continues coming towards Gabriel, screaming, and flailing his arms.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

63.     Fearing for his life, Gabriel pulls the trigger.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

64.     The gun jams.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

65.     Gabriel runs to his truck to retrieve a shotgun.  (Ex. K, Gabriel Irvin Dec. ¶ 5.)

66.     After calling 911, George starts back to where Illidge had been sitting when he sees Gabriel running towards his truck.  (Ex. M, George Irvin Dec. ¶ 4.)

67.     Illidge turns and starts coming toward George.  (Ex. M, George Irvin Dec. ¶ 6;

Ex. K, Gabriel Irvin Dec. ¶ 6.)

68.    Illidge's eyes look wild and glassy; he is speaking incoherently; he appears "berserk" to George.  (Ex. M, George Irvin Dec. ¶ 5.)

69.    As Illidge closes on him, George grips the bat and says, "Don't touch me, or I will knock you out!"  (Ex. M, George Irvin Dec. ¶ 6; Ex. K, Gabriel Irvin Dec. ¶ 6.)

70.    While waving his arms, Illidge tells George, "I don't have to touch you."  (Ex. M, George Irvin Dec. ¶ 6; Ex. K, Gabriel Irvin Dec. ¶ 6.)

71.    Watching from inside the home, Victoria sees Illidge, George, and Gabriel in the area of the porch.  (Ex. O, Shelley Dec. ¶ 4.)

72.    From the door, Victoria directs the children away to a secure area of the home. (Ex. O, Shelley Dec. ¶ 4.)

73.    Illidge moves to the door.  (Ex. M, George Irvin Dec. ¶ 6; Ex. K, Gabriel Irvin Dec. ¶ 6.)

74.    Illidge pushes and bangs on the door.  (Ex. O, Shelley Dec. ¶ 4.)

75.    Victoria is petrified.  (Ex. O, Shelley Dec. ¶ 4.)

76.    Victoria holds the locked door to keep Illidge from getting into the home. (Ex. O, Shelley Dec. ¶ 4.)

77.    Illidge hits the locked door so hard that the force pushes Victoria back.  (Ex. O, Shelley Dec. ¶ 4.)

78.    Unable to get in, Illidge stops, and walks away from the home.  (Ex. O, Shelley Dec. ¶ 4; Ex. M, George Irvin Dec. ¶ 6; Ex. K, Gabriel Irvin Dec. ¶ 6.)

79.    This portion is captured on a 911 call made by the Irvins.  Illidge is heard slamming into the door.  Gabriel, who is now armed with shotgun, orders Illidge to stop and to

get down.  Unfazed, Illidge shouts back "Just kill me now!  I will not get down!"  (Ex. L, ¶ 9; Ex. UU, 2013-03-24_19_36_33.)

80.     After Illidge leaves, Victoria and George see blood on the door.  (Ex. O, Shelley Dec. ¶ 4; Ex. M, George Irvin Dec. ¶ 6, Ex. Y, Photo of Irvin Home Door.)

81.     George and Gabriel stay outside in case Illidge returns.  (Ex. M, George Irvin Dec. ¶ 6; Ex. K, Gabriel Irvin Dec. ¶ 6.)

**First Use of Force Incident at 1920 Pierce Road Residence**

82.     At approximately 7:45 p.m., Deputy Mills and Deputy Smith receive a second call from dispatch that a naked black male has entered a home approximately three miles from the original sighting. (Ex. A, Mills Aff. ¶ 3; Ex. B, Smith Aff. ¶4; Ex. AA.)[6]

83.     Deputy Mills, upon turning onto Lee County Road 308, spots the naked black male, later identified as Khari Illidge, walking down the road.  (Ex. A, Mills Aff. ¶ 3; Ex. TT, Mills Dash Cam. Vid. 00:00-01:39; Ex. U.)

84.     Deputy Mills sees that Illidge is covered with minor cuts, scratches, and abrasions. (Ex. A, Mills Aff. ¶ 3.)

85.     Deputy Mills believes Illidge is at risk for exposure as the temperature was around 50 degrees.  (Ex. A, Mills Aff. ¶ 3.)

86.     Deputy Mills stops the patrol car and tries to speak with Illidge to determine his condition.  (Ex. A, Mills Aff. ¶ 3.) [7]

87.     Deputy Mills asks, "Hey man.  Hey, how's it going?"  (Ex. TT; Mills Dash Cam. Vid. 01:39-01:41.)

---

[6] Deputy Smith, who is farther away than Deputy Mills, also responds and starts toward the area to assist. (Ex. B, Smith Aff. ¶ 4.)

[7] The audio becomes available on Deputy Mills's dash camera video at 01:34 into the recording.

88.     While continuing to walk past Illidge replies, "Hey, how 'bout yourself?"  (Ex. TT, Mills Dash Cam. Vid. 01:39-01:42.)

89.     Deputy Mills says to Illidge, "Come here."  (Ex. TT, Mills Dash Cam. Vid. 01:42-01:43.)

90.     Illidge does appear to recognize that Deputy Mills was a deputy sheriff, ignores him, and continues to walk down the road away from him.  (Ex. A, Mills Aff. ¶ 3; Ex. TT, Mills Dash Cam. Vid. 01:39-01:42.)

91.     Deputy Mills calls dispatch, reports that he has located Illidge on Lee County Road 308 headed toward Pierce Road, turns his patrol car around, engages his flashing lights, and follows Illidge.  (Ex. TT, Mills Dash Cam. Vid. 01:43-02:14.)

92.     Illidge crosses Pierce Road into oncoming traffic, and then begins walking down a driveway for 1920 Pierce Road.  (Ex. A, Mills Aff. ¶ 4; Ex. TT, Mills Dash Cam. Vid. 02:14-02:37, Ex. V.)

93.     Deputy Mills follows Illidge down the driveway, and asks Illidge to stop and talk to him so that he can try to determine Illidge's condition. (Ex. A, Mills Aff. ¶ 4; Ex. TT, Mills Dash Cam. Vid. 02:37-2:50.)

94.     Illidge ignores Deputy Mills's command to stop and continues his seemingly-deliberate walk. (Ex. A, Mills Aff. ¶ 4; Ex. TT, Mills Dash Cam. Vid. 02:50-2:58.)

95.     Illidge appears to be focused on an unknown presence and Deputy Mills feels that Illidge is under the influence of narcotics.  (Ex. A, Mills Aff. ¶ 4.)

96.     Deputy Mills is alone and calls for backup.  (Ex. A, Mills Aff. ¶ 4; Ex. TT, Mills Dash Cam. Vid. 02:57-3:09.) [8]

---

[8] Deputy Mills uses the codes of "10-77" for "narcotics agent needed" and "10-96" for "mental

97.     As Illidge continues walking down the driveway, Deputy Mills observes him flailing his arms and hears him talking in a guttural manner. (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 3:09-3:48.)

98.     Deputy Mills continues following Illidge and asking him to stop. (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 3:15.)

99.     Illidge, zombie-like, continues to ignore Deputy Mills.  (Ex. A, Mills Aff. ¶ 5.)

100.     As they continue down the drive way, a house appears in the headlights, and Illidge walks towards it.  (Ex. TT, Mills Dash Cam. Vid. 3:48-3:58.)

101.     Deputy Mills stops the car, gets out, and commands Illidge to stop, but Illidge continues walking toward the home.  (Ex. TT, Mills Dash Cam. Vid. 3:58-4:01.)

102.     Deputy Mills follows Illidge on foot and says to him, "What's your problem man? Come talk to me."  (Ex. TT, Mills Dash Cam. Vid. 4:01-4:02.)

103.     Illidge shouts, "No!"  (Ex. TT, Mills Dash Cam. Vid. 4:03-4:04.)

104.     Illidge walks past the residence at 1920 Pierce Road and then climbs a wooden fence.  (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 4:04-4:07.)

105.     Deputy Mills follows Illidge calling "stop," "come here," "talk to me."  (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 4:07-:54.)[9]

106.     Deputy Mills radios dispatch and gives their current location.  (Ex. TT, Mills Dash Cam. Vid. 4:23-4:24.)

107.     Illidge walks about twenty feet then suddenly stops and stares at Deputy Mills. (Ex. A, Mills Aff. ¶ 5.)

---

person." (Ex. TT, Mills Dash Cam. Vid. 3:05-3; Ex. QQ, LCSO 10-Codes.)

[9] At approximately 4:20 Deputy Mills and Illidge go out of sight of the Dash Cam due to the darkness but the audio is still within range.

108.   Deputy Mills ask Illidge, "What's going on, man?" and identifies himself as "the police" (Ex. TT, Mills Dash Cam. Vid. 5:04-5:09.)

109.   At that moment, Deputy Mills hopes that Illidge recognizes him as a law enforcement officer.  (Ex. A, Mills Aff. ¶ 5.)

110.   Illidge says, "Excuse me."  (Ex. TT, Mills Dash Cam. Vid. 5:09.)

111.   Deputy Mills asks, "Hey, what's going on?"   (Ex. TT, Mills Dash Cam. Vid. 5:10-5:12.)

112.   Illidge replies, "excuse me, please."  (Ex. TT, Mills Dash Cam. Vid. 5:13.)

113.   Deputy Mills asks, "Tell me what's going on?" (Ex. TT, Mills Dash Cam. Vid. 5:14-5:15.)

114.   Illidge shouts, "Get out of my way!"  (Ex. TT, Mills Dash Cam. Vid. 5:15-5:16.)

115.   Illidge walks towards Deputy Mills entering his zone of safety.  (Ex. A, Mills Aff. ¶ 5.)

116.   Deputy Mills tells Illidge to stop or he will tase him.  (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 5:16-5:17.)

117.   Illidge continues coming at Deputy Mills.  (Ex. A, Mills Aff. ¶ 5.)

118.   Illidge screams, "Tase me! Tase me!"  (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 5:17-5:19.)

119.   When Illidge gets between three to five feet from him, Deputy Mills fires his X26 Taser. (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 5:19-5:23.)

120.   Illidge grunts but remains standing and pulls out one of the probes. (Ex. A, Mills Aff. ¶ 5.)

121.   Illidge continues walking with one probe still connected to him. (Ex. A, Mills Aff.

¶ 5; Ex. TT, Mills Dash Cam. Vid. 5:19-5:23.) [10]

122.    Deputy Mills follows Illidge. (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 5:23-5:34.)

123.    Illidge then turns and heads towards the porch of the home at 1920 Pierce Road. (Ex. A, Mills Aff. ¶ 6; Ex. TT, Mills Dash Cam. Vid. 5:34-5:37.) [11]

124.    Deputy Mills believes that Illidge is going to attempt to enter the residence.  (Ex. A, Mills Aff. ¶ 7.)

125.    Knowing that one of the probes remains attached, Deputy Mills touches Illidge's side with the Taser in drive stun mode to complete the circuit.  (Ex. A, Mills Aff. ¶ 7.)

126.    Illidge falls to the ground (Ex. A, Mills Aff. ¶ 7.)

127.    Deputy Mills attempts to pin Illidge and get him under control.  (Ex. A, Mills Aff. ¶ 8.)

128.    Deputy Mills hopes to calm Illidge down so that he can be examined by medics and taken to the hospital if needed. (Ex. A, Mills Aff. ¶ 8.)

129.    In Deputy Mills's experience, ambulance personnel or paramedics will not treat a person in Illidge's state unless the person is restrained.  (Ex. A, Mills Aff. ¶ 8.)

130.    Illidge violently resists and overpowers Deputy Mills with seemingly "superhuman strength." (Ex. A, Mills Aff. ¶ 9; Ex. W.)

131.    Illidge gets up off of the ground while Deputy Mills is still on top of him. (Ex. A,

---

[10] At approximately 5:30 in Mills's dash camera video, Illidge and Deputy Mills come back into view.

[11] Unfortunately, the 1920 Pierce Road home is not visible on Deputy Mills's dash camera due to where his patrol car is parked; thus, the subsequent struggle between Deputy Mills and Illidge takes place off camera. The audio remains available. On an additional note, while the home is not visible on the camera at this point, the home is visible earlier when Deputy Mills followed Illidge down the driveway. (Ex. TT, Mills Dash Cam. Vid. 3:39-3:52.)

Mills Aff. ¶ 9; Ex. W.)

132.    Illidge begins grappling with Deputy Mills. (Ex. A, Mills Aff. ¶ 9.)

133.    Deputy Mills has never encountered anyone as strong as Illidge. (Ex. A, Mills Aff. ¶ 9.)

134.    Deputy Mills knows that due to Illidge's altered state, Illidge can easily get on top of him and strangle him.  (Ex. A, Mills Aff. ¶ 9.)

135.    Deputy Mills becomes afraid and begins fighting for his life.  (Ex. A, Mills Aff. ¶ 9.)

136.    Deputy Mills struggles to get Illidge off of him and strikes him with the Taser several times, but it has no effect.  (Ex. A, Mills Aff. ¶ 9.)

137.    As they struggle, Deputy Mills and Illidge both fall to their knees. (Ex. A, Mills Aff. ¶ 9.)

138.    Illidge grabs Deputy Mills and slings him at least ten feet.  (Ex. A, Mills Aff. ¶ 9.)

139.    Illidge then walks away. (Ex. A, Mills Aff. ¶ 9; Ex. TT, Mills Dash Cam. Vid. 7:00-7:02.)

140.    During his encounter with Illidge, the download logs from Deputy Mills's X26 Taser show that he discharged the Taser a total of five times, four of the discharges lasting five seconds in duration and one of the discharges lasting for six seconds.  (Ex. MM, Verified Report of Bryan Chiles - Pg 9.)

141.    All five discharges from Deputy Mills's Taser occurred over a span of 1 minute and 33 seconds.  (Ex. MM, Verified Report of Bryan Chiles - Pg 9.)

142.    Deputy Mills does not discharge his TASER again after this point.  (See Ex. TT,

Mills Dash Cam. Vid. 7:00; see also Ex. MM, Verified Report of Bryan Chiles - Pg 9.) [12]

143.    Deputy Mills is too exhausted to give immediate chase.  (Ex. A, Mills Aff. ¶ 10.)

**Second Use of Force Incident at the 1866 Pierce Road Residence**

144.    Deputy Mills radios into dispatch "10-48," for officer needs assistance.  (Ex. A, Mills Aff. ¶ 10; Ex. TT, Mills Dash Cam. Vid. 7:03-7:16.) [13]

145.    At 7:48 p.m., Lee County Deputy Charles Jenkins hearing the distress in Deputy Mills's voice activates his emergency lights and siren and hurries to assist him.  (Ex. C, Jenkins Aff. ¶ 2.)

146.    After catching his breath a bit, Deputy Mills follows after Illidge.  (Ex. A, Mills Aff. ¶ 10; Ex. TT, Mills Dash Cam. Vid. 7:17-7:19.) [14]

147.    Deputy Mills spots Illidge approximately seventy-five to one-hundred yards away

---

[12] This fact requires some explanation. The download logs from the X26 Taser show that Mills discharged the Taser a total of five times, four of the discharges lasting five seconds in duration and one of the discharges lasting for six seconds. (Ex. MM, Verified Report of Bryan Chiles - Pg 9.) Additionally, the logs show that the X26 Taser was discharged between the times of 19:47:04 and 19:48:37. (Ex. MM, Verified Report of Bryan Chiles - Pg 9.) Thus, the span of time between the first and last discharge is 1 minute and 33 seconds. However, because the time stamp on the activation log is at the end of the discharge, (Ex. MM, Verified Report of Bryan Chiles - Pg 8), an additional 5 seconds must be added to account for the first discharge. Thus, the span of time between the start of the first discharge and the end of the last discharge is a total of 1 minute and 38 seconds.

On the audio of Mills's dash cam video, Mills can be heard giving a warning that he will use the Taser then its discharge can be heard on the audio at 5:20. Taking into account the 1 minute 38 second timespan between Taser discharges, Mills X26 Taser was never used on Illidge again after approximately 6:58 on Mill's dash cam video. Two seconds later, video show Illidge walking away. (Ex. TT, Mills Dash Cam. Vid. 7:00.)

[13] On the dash cam video, Deputy Mills can be heard calling in a code 10-48, which means officer needs assistance. Ex. QQ, LCSO 10-Codes, Ex. TT.)

[14] At this point, no further incidents between Deputy Mills and Illidge are captured on the dash cam video, but the audio continues for a portion of the pursuit. Additionally, officers can be seen arriving at the residence, and search for Mills, until learning they have moved.

walking in a horse pasture heading towards another residence at 1866 Pierce Road. (Ex. A, Mills Aff. ¶ 10.)

148.    Deputy Mills sees Illidge climb over a barbed wire fence.  (Ex. A, Mills Aff. ¶ 10.)

149.    Even though Illidge is naked, the barbed wire fence appears to have no effect on him, and Illidge continues on his determined walk. (Ex. A, Mills Aff. ¶ 10.)

150.    Upon watching Illidge climb over the barbed wire, Deputy Mills realizes that he is immune to any pain control techniques.  (Ex. A, Mills Aff. ¶ 10.)

151.    Meanwhile, Deputy Smith has unable to find Deputy Mills at the last reported location, but searches onward and sees the flashing lights of Deputy Mills's patrol car parked in the driveway at 1920 Pierce Road.  (Ex. B, Smith Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 7:03-7:16.)

152.    Deputy Smith initially cannot find Deputy Mills but then sees Mills's flashlight in horse pasture to his right and runs towards him.  (Ex. B, Smith Aff. ¶¶ 5, 6; Ex. TT, Mills Dash Cam. Vid. 8:37-8:46.)

153.    Deputy Smith joins Deputy Mills, and they continue though the pasture after Illidge who is running and moving very athletically.  (Ex. A, Mills Aff. ¶ 11; Ex. B, Smith Aff. ¶ 6.)

154.    Deputies Mills and Smith continually call for Illidge to stop, but he ignores them and shouts incoherently. (Ex. B, Smith Aff. ¶ 6.)

155.    Deputy Smith believes that Illidge may be suffering from excited delirium. (Ex. B, Smith Aff. ¶ 6.)

156.    As Deputy Mills and Deputy Smith cross the barbed-wire fence, Illidge arrives at

rear of a home at 1866 Pierce Road where he pauses momentarily and stares at the light coming from the home.  (Ex. A, Mills Aff. ¶ 11; Ex. B, Smith Aff. ¶ 7, Ex. Q - T, Ex. AA, Google Earth Photograph of Area between Lee Co. Road to 1866 Pierce Road.)

157.    At approximately 9:00 p.m., 67 year-old Gloria Warr in the den of her home watching television when she hears the sound of someone trying to open the back patio door. (Ex. P, Warr Dec. ¶ 2; Ex. A, Mills Aff. ¶ 11.)

158.    Gloria looks out of the window and sees Illidge at the door.  (Ex. P, Warr Dec. ¶ 2.)

159.    Not knowing the intentions of a naked man trying to enter her home, Gloria quickly retrieves a pistol to protect herself in case he gets in.  (Ex. P, Warr Dec. ¶ 2.)

160.    Phenix City Police Officer David Butler having made his way to the 1920 Pierce Road home and across the pasture arrives at the Warr home just behind Deputy Mills and Deputy Smith.  (Ex. E, Butler Aff. ¶¶ 1-4; Ex. Q-T.)[15]

161.    Deputy Mills and Deputy Smith split apart to flank Illidge. (Ex. A, Mills Aff. ¶ 11.)

162.    Deputy Mills knows they need to detain Illidge and stop him from entering another home.  (Ex. A, Mills Aff. ¶ 11.)

163.    Officer Butler hears Illidge say, "I almost made it."  (Ex. E, Butler Aff. ¶ 4.)

164.    Deputy Mills and Deputy Smith tell Illidge to get on the ground, but he does not comply.  (Ex. E, Butler Aff. ¶ 4.)

165.    Having returned to her door of her home, Gloria sees that three law enforcement officers have arrived and are confronting Illidge.  (Ex. P, Warr Dec. ¶ 3.)

---

[15] Exhibits Q-T are photographs taken at the 1866 Pierce Road home.

166.    Gloria sees Illidge gesture at the officers with clenched fists.  (Ex. P, Warr Dec. ¶ 3.)

167.    Turning, Illidge comes at the officers in an aggressive manner.  (Ex. A, Mills Aff. ¶ 11; Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 4.)

168.    Deputy Smith deploys his X2 Taser one probe striking Illidge in the chest and the other striking him below his waist.  (Ex. A, Mills Aff. ¶ 11; Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 4.)

169.    Illidge falls down onto the patio and on his stomach.  (Ex. A, Mills Aff. ¶ 11; Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 5; Ex. E, Butler Aff. ¶ 5; Ex. P, Warr Dec. ¶ 3.)

170.    Deputy Mills, Deputy Smith, and Officer Butler rush to secure Illidge.  (Ex. A, Mills Aff. ¶ 11; Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 5.)

171.    Deputy Mills and Officer Butler go to the ground and attempt to secure Illidge's arms to handcuff him.  (Ex. A, Mills Aff. ¶ 12; Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 5.)

172.    Illidge violently resists the officers.  (Ex. A, Mills Aff. ¶ 12; Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 5.)

173.    All three officers struggle against Illidge's seemingly superhuman strength to pull his arms together. (Ex. B, Smith Aff. ¶ 7; Ex. E, Butler Aff. ¶ 5.)

174.    Illidge flails and kicks at the officers.  (Ex. A, Mills Aff. ¶ 12.)

175.    Deputy Smith deploys his Taser several times, but it has little effect and Illidge continues to fight.  (Ex. B, Smith Aff. ¶ 7.) [16]

176.    Illidge kicks Deputy Smith.  (Ex. B, Smith Aff. ¶ 7.)

---

[16] Both Deputy Mills and Officer Butler were unaware that Deputy Smith used his Taser during this part of the struggle, but note that if he did it had no effect on Illidge (Ex. A, Mills Aff. ¶ 12; Ex. E, Butler Aff. ¶ 5; Ex. FF.)

177. As they struggle, the second cartridge in Deputy Smiths X2 Taser unknowingly discharges one probe hitting the bottom of Illidge's left foot.  (Ex. B, Smith Aff. ¶ 8.) [17]

178. Deputy Smith puts down his Taser to assist Deputy Mills and Officer Butler with pulling Illidge's arms together to handcuff him.  (Ex. B, Smith Aff. ¶ 8.) [18]

179. Deputy Smith sees the probe in Illidge's foot, realizes his Taser has mistakenly discharged, and pulls out the probes.  (Ex. B, Smith Aff. ¶ 8.)

180. After a lengthy struggle, Deputy Mills, Deputy Smith, and Officer Butler are able to secure Illidge in handcuffs, but he continues resisting and kicks violently.  (Ex. A, Mills Aff. ¶ 12; Ex. B, Smith Aff. ¶ 9; Ex. E, Butler Aff. ¶¶ 6-7.)

181. Even with three men on him and pulling on his arms, Illidge is able get up and move them over twenty feet. (Ex. B, Smith Aff. ¶ 7.)

182. From her door, Gloria watches Illidge carry the officers over twenty feet and up some steps that lead from her patio to her garden.  (Ex. P, Warr Dec. ¶ 3.)

183. Deputy Smith uses an ASP baton as leverage with the handcuffs to control Illidge's arms.  (Ex. B, Smith Aff. ¶ 9; Ex. E, Butler Aff. ¶ 7.)

184. Illidge is not struck by anyone. (Ex. P, Warr Dec. ¶ 5; Ex. C, Jenkins, ¶ 8.)

185. Despite having Illidge in handcuffs and using a baton for leverage, Illidge continues to resisting and kicking.  (Ex. E, Butler Aff. ¶ 7.)

186. Officer Butler moves to Illidge's legs and puts his knees on Illidge's ankles to stop the kicking.  (Ex. E, Butler Aff. ¶ 7.)

---

[17] Deputy Smith's X2 Taser contains two bays each containing a deployable cartridge. (Ex. MM, Verified Report of B. Chiles – Pgs 9-10.) Thus, unlike other models, the X2 Taser does not require reloading a new cartridge before deploying the probes a second time.

[18] Once Deputy Smith put down the Taser to assist in handcuffing Illidge, he did not use it again on Illidge. (Ex. B, Smith Aff. ¶ 8.)

187.    Phenix City Police Officers Shawn Sheely and Joey Williams arrive and find Deputy Mills, Deputy Smith, and Officer Butler struggling to secure Illidge.  (Ex. F. Sheely Aff. ¶¶ 1-4; Ex. G, Williams Aff. ¶¶ 1-6.)

188.    Officer William relieves the physically exhausted Deputy Mills.  (Ex. A, Mills Aff. ¶ 13; Ex. B, Smith Aff. ¶ 9; Ex. E, Butler Aff. ¶ 9; Ex. G, Williams Aff. ¶¶ 7-8; Ex. F. Sheely Aff. ¶ 4.)

189.    Deputy Mills then lies on the ground injured, exhausted, and unable to assist further with Illidge.  (Ex. A, Mills Aff. ¶ 13.) [19]

190.    Officer Sheely leaves the immediate struggle to locate leg restraints and then returns shortly thereafter to help hold Illidge's legs. (Ex. F. Sheely Aff. ¶¶ 4-5.)

191.    Although restrained in handcuffs with three officers attempting to control him, Illidge continues to resist bucking the officers off of him and kicking violently.  (Ex. G, Williams Aff. ¶ 9; Ex. F. Sheely Aff. ¶ 6.)

192.    Lee County Deputy Jenkins arrives with leg shackles as Illidge continues struggling with the officers, kicking violently, and trying to get up.  (Ex. B, Smith Aff. ¶ 10; Ex. C, Jenkins Aff. ¶¶ 1-5.) [20]

193.    After several minutes, the officers are able to affix the leg irons.  (Ex. C, Jenkins Aff. ¶ 5; Ex. E, Butler Aff. ¶ 9.)

194.    Because the leg irons have a significant amount of slack in them, Illidge is still able to kick at the officers. (Ex. C, Jenkins Aff. ¶ 5; Ex. E, Butler Aff. ¶ 9.)

---

[19] At this point, Deputy Mills had no further contact with Illidge and was subsequently treated at the hospital for exhaustion and a torn bicep. (Ex. A, Mills Aff. ¶¶ 13-15.)

[20] Paramedics and an ambulance were called before Deputy Jenkins arrived, but had not yet arrived. (Ex. C, Jenkins Aff. ¶ 4.)

195.    Deputy Smith threads three sets of linked flex cuffs from the chain of the leg irons to the handcuffs, not so tight as to "hog-tie" Illidge but to limit his mobility and ability to kick at the officers. (Ex. B, Smith Aff. ¶ 10; Ex. C, Jenkins Aff. ¶ 5; Ex. F. Sheely Aff. ¶ 5.)

196.    Even with these restraints, Illidge continues to struggle.  (Ex. B, Smith Aff. ¶ 10.)

197.    Throughout their struggle with Illidge the officers have repeatedly told Illidge to calm down.  (Ex. B, Smith Aff. ¶ 11; Ex. C, Jenkins Aff. ¶ 5; Ex. E, Butler Aff. ¶ 6; Ex. F, Sheely Aff. ¶ 4.)

198.    During the struggle, Gloria has heard the officers repeatedly telling Illidge "calm, down."  (Ex. P, Warr Dec. ¶ 5.)

199.    During the struggle, Gloria has seen the officers holding Illidge down as he continued to struggle, growl, and kick at the officers but never observed any of the officers striking, kicking, or otherwise abusing Illidge.  (Ex. P, Warr Dec. ¶¶ 3, 5.)

200.    Officer Sheely leaves the immediate struggle to call dispatch to find the ETA of an ambulance and is advised the Lee County had already dispatched an ambulance.  (Ex. F. Sheely Aff. ¶ 7.)

201.    Deputy Smith, asked Illidge his name and he said "Michael" and then repeated "Michael." (Ex. B, Smith Aff. ¶ 11.)

202.    Deputy Jenkins leaves Illidge and goes to check on Deputy Mills's condition. (Ex. C, Jenkins Aff. ¶¶ 6-7.)

203.    Suddenly, Illidge becomes unresponsive.    (Ex. B, Smith Aff. ¶ 12; Ex. G, Williams Aff. ¶ 10.)

204.    Approximately 23 minutes lapsed from the time the Taser is last used and when Illidge becomes unresponsive. (Ex. LL, Kroll Report - Pg 16.)

205.    Illidge is turned onto his side and Deputy Smith places his ear to Illidge's chest to listen for breathing and detects none.   (Ex. B, Smith Aff. ¶ 12; Ex. C, Jenkins Aff. ¶ 7; Ex. G, Williams Aff. ¶ 10.)

206.    Illidge's handcuffs are removed and the flex cuffs are cut off so that CPR can be performed.  (Ex. C, Jenkins Aff. ¶ 7.)

207.    Deputy Smith, Deputy Jenkins and other officers take turns giving Illidge CPR until EMS arrives.  (Ex. B, Smith Aff. ¶ 12; Ex. C, Jenkins Aff. ¶ 7; Ex. A, Mills Aff. ¶ 14.)

208.    EMS personnel place Illidge on an automatic chest compression machine and transport him to the hospital where he is pronounced dead.  (Ex. E, Butler Aff. ¶¶ 12-15.)

## Post-Mortem Testing and Related Matters

209.    An autopsy was performed on Illidge by forensic pathologist Dr. Stephen Boudreau of Alabama Department of Forensics Sciences.  (Ex. II, Boudreau Aff.  ¶¶ 1-3.)

210.    Dr. Boudreau's final autopsy report concluded there was no obvious anatomic cause of death and the manner of death as undetermined.  (Ex. II, Boudreau Aff.  ¶ 3; Ex. GG, Autopsy Report - Pg 1.)

211.    Upon subsequently reviewing materials that were unavailable to him at the time of his final autopsy report, (Ex. II, Boudreau Aff.  ¶¶ 4-10), Dr. Boudreau now concludes that "Illidge died as a result of excited delirium syndrome brought on by his taking of an unknown substance." (Ex. II, Boudreau Aff. ¶ 11.)

212.    Toxicology reports results were consistent with Nicholas Woodham's testimony regarding Illidge's alcohol and marijuana usage on the day of his death; however, no LSD was discovered postmortem.  (Ex. KK Verified Expert Report of Dr. Stacey Hail - Pg 17; Ex. HH,

Toxicology Report.) [21]

213.    No LSD was discovered postmortem because the "strip of LSD" as described by Nicholas Woodham did not contain LSD but rather was "synthetic LSD" which is sprayed onto blotter papers like Illidge consumed and available for purchase on the internet.  Synthetic LSD is extremely difficult for toxicology laboratories to keep up with and NMS Labs, who performed the testing, is approximately six month behind developing testing protocols when new designer drugs begin to appear on the street.  Noticeably absent from the NMS Labs testing was one of the most popular versions of the chemical compounds that are sold on blotters papers like the ones ingested by Illidge.  (Ex. KK Verified Expert Report of Dr. Stacey Hail - Pgs 17-19.)

214.    Illidge demonstrated the signs of excited delirium or agitated delirium.

Mr. Illidge demonstrated all of the signs of excited delirium or agitated delirium. This condition has been known for 150 years and was originally called Bell's mania. Its symptoms include sudden onset of bizarre behavior, incoherent shouting, paranoia, combativeness, hyperactivity, aggression and demonstration of extreme strength. These are identical to the signs of Mr. Illidge's illness.  These persons were at risk for sudden death. . . .

Over the past 40 years, excited delirium has become known for its association with drug ingestion (usually cocaine), and various forms of restraint when persons suffering from this disorder encounter law enforcement.  Because of the association of one or more of these factors: illicit drug use, restraint and Taser, some persons have attributed the cause of sudden death in these cases to the use of police restraint and or Taser. However, excited delirium alone without emergency medical attention is a highly lethal condition and the course to death is inevitable even before law enforcement personnel encounter the person.

(Ex. JJ, Affidavit and Expert Report of Dr. Jim Lauridson - Pg 3.)[22]

---

[21]  Dr. Stacey Hail is physician who board certified in emergency medicine and medical toxicology who has been retained as an expert by the defendants. (Ex. KK Verified Expert Report of Dr. Stacey Hail - Pgs 1-2.) Ultimately, Dr. Hail concludes that Illidge died from excited delirium syndrome induced by ingestion of a synthetic LSD derivative rather than from his exposure to multiple discharges of the Tasers. (Ex. KK Verified Expert Report of Dr. Stacey Hail - Pg 35.)

[22]  Dr. James Lauridson is a physician with specialty training and board certification in internal

**Facts as to the Supervisory-based Claims against Sheriff Jay Jones**

215.    Defendant Jay Jones is and has been the Sheriff of Lee County, Alabama since 1999, and as sheriff, he is the chief law enforcement officer for Lee County, the ultimate policymaker for the Sheriff's Office, and the ultimate decision-maker on personnel matters. (Ex. D, Jones Aff. ¶¶ 1-2.)

216.    The Lee County Sheriff's Office has used Tasers since 2006. Each patrol deputy is provided a Taser, and in total 111 are distributed to the personnel. Before the deputy is allowed to use a Taser, he/she must be trained on its uses and potential risks.  (Ex. D, Jones Aff. ¶ 3.)

217.    Taser training includes the following:

Only Tasers issued by the Lee County Sheriff's Office will be authorized for use by Lee County Deputy Sheriff's.

a.    Only those deputies that have been certified by a qualified Taser instructor will be permitted to carry a Taser.

   1.    To become a qualified Taser instructor, the following steps must be taken:

      A.    Letter of recommendation from immediate supervisor.

      B.    Attendance at an approved training site.

      C.    Receive final approval from the Sheriff of Lee County.

b.    Certification will require the following steps.

   1.    Written Exam

      A.    The length and scope of this exam will be determined by those

medicine, anatomic pathology, and forensic pathology who has been retained as an expert by the defendants. (Ex. JJ, Affidavit and Expert Report of Dr. Jim Lauridson - Pg 1.) Ultimately, Dr. Lauridson concludes that there is no factual evidence that Taser usage caused or contributed to Illidge's death and conjectures conclusions that police restraint or Taser use caused or contributed to the Illidge's death are unsupported by factual evidence and speculative. (Ex. JJ, Affidavit and Expert Report of Dr. Jim Lauridson - Pgs 3-4.)

individuals who are certified as instructors.

    B.    A passing grade of 90% will be required.

2.    Practical Exam

    A.    The practical exam will consist of:

        1.    Firing the weapon using training cartridges and in-addition

        2.    Each deputy must receive a short burst from the Taser Instructor.

            a.    The short burst will last from 1 to 5 seconds.

        3.    Each deputy shall fire the weapon twice at a predetermined target.

3.    Initial certification will require a 6 hour class.

    a.    Recertification will be a 4 hour class.

4.    Recertification will be required annually

(Ex. D, Jones Aff. ¶ 4.)

218.    Lee County Sheriff's Office has 4 certified Taser instructions. Each deputy must be re-certified annually.   (Ex. D, Jones Aff. ¶ 5.)

219.    The Lee County Sheriff's Office follows the use of force continuum that is set out in the Policies and Procedures Manual. Deadly force is defined as force that is likely to cause death or serious physical injury. Less-than-lethal force is force which is described by the U.S. Supreme Court as that which will not cause death. Deadly force may only be used to protect the deputy or others from what is reasonably believed to be an immediate threat of death, physical injury, or prevent the escape of a fleeing felon whom the deputy has probable cause to believe will pose a significant threat to human life.  (Ex. D, Jones Aff. ¶ 6, Ex. CC, Lee County Use of Force Policy, 2007; Ex. DD Lee County Use of Force Policy 1999.)

29

220.    Less-than-lethal force may be used by a deputy to de-escalate a situation and bring a subject under control. Appropriate times to use less-than-lethal force are To protect themselves or another from physical harm; to restrain or subdue a resistant individual; to bring an unlawful situation safely and effectively under control; to protect themselves from animals which pose a threat to the safely of the deputy or others; or training.  (Ex. D, Jones Aff. ¶ 7, Ex. CC, Ex. DD.)

221.    The use of a Taser is less-than-lethal force. It can be used after a loud verbal warning is given to the subject of its imminent use. After its use, if feasible, EMS should be summoned to examine the subject prior to transport to jail. (Ex. D, Jones Aff. ¶ 8, Ex. CC.)

222.    The Taser should be used safely, such as not against subjects where there is a risk of a high fall or those covered in or near flammable liquids or materials. The policy and procedures do not prevent a deputy from firing the probes in the direction of a subjects chest because such a prohibition is impracticable. (Ex. D, Jones Aff. ¶ 9, Ex. CC.)

223.    A written report must be prepared by the deputy when less-than-lethal force is used on a person, including the use of a Taser and submitted to the deputy's supervisor. This report and the circumstances of its use, including any video of the incident, are reviewed by the shift lieutenant to determine if the use of force was proper.  All use of force reports and their review are forwarded to Sheriff Jones through the chain of command. (Ex. D, Jones Aff. ¶ 10, Ex. CC.)

224.    In regard to the incident with Khari Illidge, the use of the Tasers by Corporal Steven Mills and Deputy Raymond Smith and the entire incident in attempting to subdue him were reviewed through the chain of command and determined to be proper. The force was used to protect themselves or another from physical harm, to restrain or subdue a resistant individual,

and to bring an unlawful situation safely and effectively under control. (Ex. D, Jones Aff. ¶ 11.)

225.   The confrontation with Illidge and his subsequent death were investigated by the Alabama Bureau of Investigation and ultimately by the Lee County Grand Jury. No violation of law was found. Indeed, the Grand Jury specially commended Cpl. Mills for his conduct in his confrontation with Illidge. (Ex. D, Jones Aff. ¶ 13; Ex. BB, Grand Jury Report.)

226.   Sheriff Jones has not received any prior complaints involving the use of excessive force by Deputy Mills, Deputy Smith, or Deputy Jenkins. (Ex. D, Jones Aff. ¶ 14.)

227.   Sheriff Jones has not had a significant number of complaints regarding the overuse or misuse of Tasers by Lee County deputies as to put him on notice that there is an issue with training.  Sheriff Jones attributes the lack of complaints to our training and review process. (Ex. D, Jones Aff. ¶ 15.)

228.   Contrary to the Plaintiff's allegations, Taser does not forbid the firing of probes into the chest of a subject.  Its warnings do state to avoid firing at a subject's mid-chest if "practicable" to avoid the slight risk of a cardiac arrest.  This risk is found when the subject is very thin, which is not the case with Mr. Illidge, who weighed over 200 pounds. Further, very often, it is not "practicable."  When a subject is charging at officers or turns towards officer, the probes, when fired, will almost always strike the front of the subject. The officer/deputy has to make a split second decision when firing the Taser.  (Ex. D, Jones Aff. ¶ 16; Ex. EE.)

229.   Sheriff Jones reviewed the allegations in paragraph 48 of the Second Amended Complaint, which cited 20 instances (5 of which occurred after the confrontation with Illidge) where the Plaintiff claims deputies "wantonly" fired Tasers in the chest area of subjects or where a Taser was deployed after the subject was handcuffed.  All of these instances were previously reviewed per policy and found to be proper but for the sake of clarity, Sheriff Jones addresses

them again as follows:

a.  March 23, 2011: Deputy responded to call of a burglary in progress. The subject arrived
    on the scene and was loud and disorderly. When he refused to comply with the deputy's
    orders and was warned, he was tased, striking him in the chest. Subject simply pulled the
    probes from his and said that the tasing did not hurt. Subject was arrested without further
    incident.

b.  June 7, 2011: Deputy was the victim of an assault by an automobile. The subject refused
    to comply with orders to get on the ground and was tased. The probes struck the subject
    in the left pectoral area and just above his beltline. The subject was taken into custody
    without further incident.

c.  July 30, 2011: Subject was being arrested for disorderly conduct and minor in possession
    of alcohol. After he was handcuffed, subject refused to and resisted in getting into the
    patrol vehicle. The deputy used his Taser in drive-stun mode, applying it to the subject's
    hip. He then complied with the deputy's orders and was transported without further
    incident.

d.  February 23, 2012: Subject was arrested for domestic violence. After being placed in the
    patrol vehicle, subject began kicking the door. He was advised to stop, and when he did
    not, he was tased, with the probes striking him in the left arm and back. He suffered no
    injury and was transported to jail without further incident.

e.  March 3, 2012: Subject was drunk and disorderly at a night club and striking a vehicle
    with a beer bottle. When deputies arrived at the scene, subject was found passed out
    inside a truck with his legs hanging out of the door. When he was awakened by the
    deputies, he became disorderly and combative. Deputy then tased him with the probes
    striking him in the back. He was then handcuffed. When being treated by EMS, he again
    became combative. When he was placed in the patrol car, he began kicking at the
    deputies and kicking the vehicle. He was then drive-stunned on two occasions so that he
    could be transported to jail.

f.  March 7, 2010: Subject was being arrested for DUI but was resisting. He kept saying that
    he was not going to jail and for the deputies to kill him. He would not get into the patrol
    vehicle. Deputy then drive-stunned the subject twice to the lower back. It had no effect,
    and the subject stated, "You can tase me. I can take it. I want you to shoot me." EMS was
    called, and the subject was treated for minor injuries. He was then taken to jail.

g.  August 28, 2012: Deputies were called to a domestic violence scene where the subject
    punched his wife in the eye. Subject ran from the deputies when they attempted to arrest
    him. Deputy fired his Taser with the probes striking the subject in the chest. When he
    continued to resist, the Taser was cycled a second time. Subject was then placed into
    custody. He was treated by EMS and then taken to jail.

h.  September 11, 2012: Mental subject was threatening to kill his family and was armed

with a shotgun. When the deputies arrived at the scene, they were faced with a hostage situation. When they were attempting to contact the subject, he ran out on the porch and screamed, "Just shoot me!" A deputy then ran up to him and fired his Taser, striking the subject in the upper torso and waist. He was then taken into custody and transported to a mental health facility.

i.   September 19, 2012: Deputy was attempting to apprehend a dangerous felon on multiple warrants. He fled from her. She deployed her Taser and aimed at his back. Subject then turned and charged the deputy as she fired. The probes struck the subject in the torso. It had no effect on him, as he tackled the deputy and escaped.

j.   September 21, 2012: Subject was at a high school football game smoking marijuana. Deputies found that he had several outstanding warrants. Subject ran from the deputies. They fired on two occasions their Tasers, each time missing.

k.   November 12, 2012: Subject was arrested for domestic violence and placed in a patrol car. Subject kept kicking at the vehicle and banging her head against the divider. Subject's legs were restrained to restrict her movement and prevent injury. When instructed to put her legs back in the vehicle, she refused. The deputy then deployed his Taser in drive stun mode against the subject's legs. Subject's legs were then placed inside the vehicle, and she was transported to jail.

l.   February 1, 2013: Deputies were called to a scene of a fight in progress where a knife was pulled. A vehicle had left the scene, and after it was stopped by deputies, the driver did not put it in park or exit the vehicle as directed. As one deputy had his service weapon drawn on the subject, two deputies simultaneously fired their Tasers, striking the subject in the back and chest. The subject suffered no injuries.

m.   February 2, 2013: Deputies were called to a domestic violence call, where the subject had viciously assaulted a female. As the deputies were trying to investigate the matter, the subject kept interjecting himself in the matter. He was taken to the ground and handcuffed. As he was being placed in the patrol vehicle, the subject kicked a deputy twice. The deputy removed the cartridge and drive-stunned the subject twice. It had no effect, as the subject continued to resist and not put his legs in the vehicle. At that time, the deputy placed the cartridge on it and deployed her Taser. The probes struck the subject in the chest. He suffered no injuries, but was examined by EMS personnel.

n.   March 23, 2013: Deputy was called to a domestic disturbance where the subject was standing near a pool table and had access to multiple items that could be used as a weapon. The deputy attempted to place his hands on the subject. He pulled away and became hostile. The deputy unholstered his Taser; the subject became more hostile. He yelled, "Tase me!" He reached behind his back as if grabbing a weapon. At that moment, the deputy fired his Taser, and the probes struck the subject in the chest. The subject was not injured.

o.   March 24, 2013: This is the date of the altercation with Illidge, which was discussed

33

above.

p.   April 1, 2013: Deputies responded to a domestic call. While investigating it, they found that the subject had outstanding warrants. When the deputies attempted to place him in custody, he barricaded himself inside his mobile home where he had access to weapons. The deputies attempted to talk him out to avoid making entry and risking serious injury or death. The subject went to the door on three occasions to shout at the deputies. On the third occasion, one of the deputies fired his Taser, with the probes striking the subject above his left nipple and at his waist. The subject fell back into his mobile home. The subject yelled for the deputies to stop tasing him and that he was never coming outside. He then called 911, and as he was distracted, the deputies rushed inside and apprehended him. The subject refused medical treatment.

q.   May 30, 2013: Deputies responded to a scene where the subject had assaulted his father. When attempting to apprehend the subject, he assaulted a deputy. In order to control the subject, the deputy fired his Taser. The probes struck the subject in the chest but did not penetrate the skin. The subject was taken into custody without incident. He did not suffer injury.

r.   August 9, 2013: Deputies noticed a door of a residence ajar. They entered the house and found the subject inside. He had cuts to his head and hands where he had broken windows and glass. The subject was told to lie down on the floor. When he did not comply, a deputy fired his Taser with the probes striking the subject in the stomach. The subject was taken into custody. He was treated for the cuts he suffered while breaking into the home.

s.   August 29, 2013: Deputies were called to domestic violence scene and were advised that the subject was threatening to kill everyone in the home and himself. He was armed with a knife and a machete and barricaded himself in a bathroom. Verbal commands did not work. The deputies then tried to use pepper spray through a crack, which was also ineffective. Deputies then pushed through the door and deployed the Taser. The probes struck the subject in the right upper chest and right upper abdomen. He was incapacitated long enough for the deputies to take the knives from him. He was treated for minor self-inflicted wounds to his left wrist. He was taken to a mental health facility.

t.   January 11, 2014: Subject was in the middle of the road trying to flag down vehicles. When a deputy arrived, subject began to act nervously. When the deputy asked, subject admitted that he possessed narcotics and a BB gun. When asked to empty his pockets, subject complied but then put a pill in his mouth and fled. Deputy deployed the Taser, and the probes struck the subject in the back. Because he wearing a heavy jacket, the Taser had no effect. Subject still did not comply with the deputy's orders; deputy then drive-stunned the subject. He was then apprehended. EMS examined him and noted no injury.

(Ex. D, Jones Aff. ¶ 19.)

230.    Upon review, Sheriff Jones concluded that all 20 instances of Taser, contrary to the baseless allegations otherwise, simply are not examples of "wanton" use of a Taser by Lee County deputy sheriffs.  To the contrary, these instances show that the deputies' conduct saved lives.  They also show that in every case, except the incident with Illidge, the subject was not injured.  These instances also show that the use of the Taser all but eliminated the use of "hands on" techniques, which increase the risk of injury to the subject and the deputy.  Finally, these instances show the dangers that the deputies face every day in performing his/her duties.  (Ex. D, Jones Aff. ¶ 20.)

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   The party requesting summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).


(Remainder of page intentionally left blank)

## SUMMARY OF REMAINING CLAIMS AGAINST LEE COUNTY
## <u>DEFENDANTS JONES, MILLS, SMITH, AND JENKINS</u>

The Second Amended Complaint, (Doc 40), alleges four causes of actions against Lee County Sheriff Jay Jones, Deputy Steven Mills, Deputy Ray Smith, and Deputy Charles Jenkins.[23]   Count I contains a § 1983 claim for excessive force against Deputy Mills and Deputy Smith.[24]   (Doc 40 ¶¶ 63-71.)   Count III contains a § 1983 claim for failure to intervene against Deputy Mills and Deputy Jenkins.   (Doc 40 ¶¶ 81-86.) [25]

The causes of action against Sheriff Jones are contained in Counts V and VI and are based solely on his status as a supervisor.   Count V contains a § 1983 claim for failure to train and supervise against Sheriff Jones.   (Doc 40 ¶¶ 96-101.) [26]   Count VI contains § 1983 claim for failure to discipline against Sheriff Jones.   (Doc 40 ¶¶ 102-109.)

---

[23] Counts II, IV, and VII are alleged only as to the Phenix City defendants.

[24] In the current version of the complaint, Deputy Jenkins was also included in Count I for excessive force; however, this Court has dismissed Count I as to Jenkins with prejudice. (Doc 55 - Pg 10.)

[25] In an earlier version of the complaint, Deputy Smith was included in the failure to intervene claim, but this Court dismissed the claim as to Smith with prejudice. (Doc 36 - Pg 14.)

[26] Count V is also alleged against Phenix City Defendant Raymond J. Smith not to be confused with Lee County Deputy Ray Smith.

## ARGUMENT

It is undisputed that Illidge was in a severely altered mental state. All eyewitness accounts as well as Deputy Mills's dash cam video demonstrate the severity of Illidge's drug induced state. If there is any doubt as to the serious potential harm Illidge posed to the public, an article recently published in a Rhode Island newspaper demonstrates precisely the danger a person in a drug-induced altered state like Illidge poses to the public.

A 60 year-old man working at his home woodshop called 911 to report the strange behavior of man who emerged from the woods. ProvidenceJournal.com, Gregory Smith, *URI Employee 'In Altered State' Accused of Beating West Greenwich Man to Death as Victim Tried to Call 911*, (June 1, 2016), http://www.providencejournal.com/news/20160601/uri-employee-in-altered-state-accused-of-beating-west-greenwich-man-to-death-as-victim-tried-to-call-911   (last visited June 2, 2016). Before police officers were able to arrive, the man in a drug-induced severely altered state attacked and beat the 60 year-old to death for no apparent reason at all. Id. Prior to this drug induced rage, the attacker was known as "an all-around good guy" but had been asked to leave work earlier that day due to "very irrational" behavior. Id. Upon arriving at the scene, police officers found the attacker partially clothed, bloody, and standing over his dead victim. Id. As he charged an officer, the attacker was shot with a Taser without effect. Id. In their efforts to stop the attacker, the police officials discharged three Tasers, used pepper spray, and released a police dog before they were able to get him under control. Id.

Likewise, Illidge was in a drug-induced and irrational state. Illidge was a potential threat of serious harm to anyone he encountered. Illidge was a threat to his own safety. There was no other choice. Illidge had to be stopped.

I.    **DEPUTIES MILLS, SMITH, AND JENKINS ARE ENTITLED TO QUALIFIED IMMUNITY.**

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Messerschmidt v. Millender, __ U.S. __, 132 S. Ct. 1235, 1244-45, (2012) (citing Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011)). To overcome a public official's entitlement to qualified immunity, a plaintiff must be able to establish not only that the public official acted wrongfully, but also be able to point the Court to law existing at the time of the alleged violation that provided "fair warning" that the conduct of the defendants was illegal. Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003). The determination of whether an officer is entitled to qualified immunity is a question of law to be decided by the court. Stone v. Peacock, 968 F.2d 1163, 1165 (11th Cir. 1992) (per curiam).

"The essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." Hagans v. Franklin County. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012) (citing see al-Kidd, 131 S.Ct. at 2085.)  The analysis does not take into account the officer's alleged subjective intent; rather, it "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules

that were clearly established at the time it was taken."  Id. (citations omitted).  Furthermore, the issue of qualified immunity must be decided "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008).

To be eligible for qualified immunity, the officers must demonstrate that they were acting in the scope of their discretionary authority.  O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004).  "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'"  Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (citing Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)).  In applying this test, courts should look to the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances."  Holloman, 370 F.3d at 1266.  "[T]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."  Godby v. Montgomery County Bd. of Educ., 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).  Under the facts of this case, Deputies Mills, Smith, and Jenkins's actions arose from their duties as deputy sheriffs in attempting to effect an arrest, protect safety, and maintain the peace.  Sheriff Jones's acts are in the capacity of supervisor over Deputies Mills, Smith, and Jenkins.  Accordingly, all these Defendants were acting within the line and scope of their discretionary authority.

Once determined that officers acted within their discretionary authority, courts use a two-part test to determine whether qualified immunity is proper.  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court directed courts to use a two-part test to determine whether qualified

immunity applies.  First, the court determines whether there was a constitutional violation, in this case whether the defendants used excessive force in violation of the Fourth Amendment. Saucier, 533 U.S. at 201.  Second, the court determines whether the constitutional right in question was clearly established.  Id.  The Court, however, abandoned the rigid order of analysis enunciated in Saucier and no longer requires courts to first determine whether there was a constitutional violation.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

> On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Pearson, 555 U.S. at 236.

### A.   Deputy Mills and Deputy Smith's use of force was constitutionally reasonable.

The test for determining whether an officer used excessive force is the "objective reasonableness" test.  Graham v. Connor, 490 U.S. 386, 395 (1989).  In Graham, the Court stated that whether a specific use of force is objectively reasonable turns on several factors such as (1) the severity of the crime, (2) whether the suspect poses an immediate threat, and (3) whether the suspect is resisting or fleeing.  Graham, 490 U.S. at 394.  Generally, the actions of the officer must be reasonable in light of the facts and circumstances confronting the officer without regard to his underlying intent or motivation.  Id. at 397.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.

The Eleventh Circuit has cautioned that courts should "not sit in judgment to determine whether an officer made the best or a good or even a bad decision . . . [but] only to determine

whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense." Buckley v. Haddock, 292 F. App'x 791, 794 (11th Cir. 2008). "We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction would prove fatal." Crosby v. Monroe County, 394 F.3d 1328, 1333-34 (11th Cir. 2004). "While the existence of less forceful options to achieve the governmental purpose is relevant, [p]olice officers . . . are not required to use the least intrusive degree of force possible." Marquez v. City of Phoenix, 693 F.3d 1167, 1174 (9th Cir. 2012), as amended on denial of reh'g (Oct. 4, 2012). "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003) (citation omitted). In this case, however, reconsideration in hindsight appears to offers no better options. Illidge was an unstoppable force. The officers could not simply let him go as he was a danger to himself and others. Absent lethal force, there were few options at the officers' disposal.

> **1.    Deputy Mills's use of force at the 1920 Pierce Road home was constitutionally reasonable.**

As an initial matter Deputy Mills only discharged his Taser at the 1920 Pierce Road home. Deputy Mills's Taser log shows that he discharged his Taser a total of five times; four of the discharges lasted for five seconds in duration, and one of the discharges lasted for six seconds; all five discharges from occurred over a span of 1 minute and 33 seconds. (Ex. MM, Verified Report of Bryan Chiles - Pg 9.) Thus, Taser logs in combination with Deputy Mills's dash cam video proves that Deputy Mills only used a Taser in his initial encounter, while he was alone, at the 1920 Pierce Road home.

All Graham factors support Deputy Mills's use of force.  What is important to note in weighing the Graham factors is that Illidge needed to be stopped, not only because he posed an immediate threat of harm to others, but also  because he posed an immediate threat of harm to himself.   In his irrational state, Illidge clearly lacked any sense of self-preservation.   For example, Illidge was unclothed in cold weather.  (Ex. A, Mills Aff. ¶ 3; Ex. B, Smith Aff. ¶ 6.) Illidge was bleeding due to numerous cuts and scrapes from walking unclothed through the woods.  (Ex. A, Mills Aff. ¶ 3; Ex. O, Shelley Dec. ¶ 4; Ex. M, George Irvin Dec. ¶ 6.)  Deputy Mills observed Illidge obliviously crossing a road into oncoming traffic.  (Ex. A, Mills Aff. ¶ 4; Ex. TT, Mills Dash Cam. Vid. 02:14-02:37, Ex. V.)  Additionally, Illidge entering homes, not only subjected homeowners to a potential threat of harm, but Illidge was subject to harm by frightened homeowners willing to use lethal force to protect themselves.  (Ex. K, Gabriel Irvin Dec. ¶¶ 4-5; Ex. P, Warr Dec. ¶ 2.) [27]  Ultimately, the law enforcement officers, in contrast to the homeowners Illidge encountered, were the only ones who thought of Illidge's well-being and simply tried to detain him.

Initially, Deputy Mills did not use any force on Illidge and spends over three and a half bizarre minutes following Illidge asking Illidge to stop and talk to him.  (See Ex. TT, Mills Dash Cam. Vid. 01:39-05:17.)  Deputy Mills does not use his Taser until after Illidge has refused his multiple commands to stop, continued to walk away, began to shout at him, started to come toward him, and entered his zone of safety.  (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 1:39-5:17.)  Even then, Deputy Mills does not discharge his Taser until after issuing a warning that he will use his Taser if Illidge does not stop.  (Ex. A, Mills Aff. ¶ 5; Ex. TT, Mills Dash Cam. Vid. 5:16-5:17.)

---

[27] It is only by sheer chance that Illidge died in the manner that he did rather than by gunshot wound at the Irvin Home. (See Ex. K, Gabriel Irvin Dec. ¶ 5; Ex. L, Gabriel Irvin Dec. ¶ 9.)

At this point, all <u>Graham</u> factors favor Deputy Mills using his Taser on Illidge.  Illidge had committed a felony, several misdemeanors, and failed to obey Deputy Mills's instructions to stop.  Deputy Mills's encounter with Illidge at the 1920 Pierce Road home was due to two calls from dispatch.  The first call regarding a report of a naked, black male running down Lee County Road 314, (Ex. A, Mills Aff. ¶¶ 1-2; Ex. B, Smith Aff. ¶ 3), constituted a Class C misdemeanor public lewdness. Ala. Code § 13A-12-130.   The second call from dispatch was regarding a suspect, fitting the description and near the prior sighting, entering into a home constituted a more serious crime. At the very least, Illidge committed the Class A misdemeanor of criminal trespass when he entered the Irvin home.  Ala. Code § 13A-7-2 (stating "[a] person is guilty of criminal trespass in the first degree if he knowingly enters or remains unlawfully in a dwelling").[28]   More seriously, entering the Irving home provided probable cause, or at least arguable probable cause,[29] for Deputy Mills and the other officers to believe that Illidge committed a Class C felony for burglary in the third degree.  Ala. Code § 13A-7-7 (stating a person commits the crime of burglary in the third degree "if he knowingly enters or remains unlawfully in a building with intent to commit a crime therein").

Additionally, Illidge posed an immediate threat to Deputy Mills.  Illidge's behavior was bizarre, he appeared in to be in an altered state, and had refused to comply with any of Deputy Mills's directions. More importantly Illidge started coming toward Deputy Mills, and despite a

---

[28] The relevant Alabama statute defines a "dwelling" as "[a] building which is used or normally used by a person for sleeping, living or lodging therein." Ala. Code § 13A-7-1(2). The Irving's home was a dwelling by statute.

[29] When qualified immunity is at stake the issue is not whether probable cause existed but whether there was arguable probable cause to arrest, which inquires "whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants *could have believed* that probable cause existed to arrest." <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1232 (11th Cir. 2004) (emphasis added).

command to stop, entered his safety zone.  Illidge had been fleeing as he had refused to stop walking away from Deputy Mills for several minute despite being told to stop.  Additionally, Deputy Mills was alone.  Law enforcement officials are not required to err on the side of caution. Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc) (citing see Davis v. Scherer, 468 U.S. 183, 196 (1984)).  In Draper v. Reynolds, the Eleventh Circuit has held that in a "difficult, tense and uncertain situation" the use of a Taser to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force.  369 F.3d 1270, 1278 (11th Cir.2004).  Subsequently, the court paraphrased Draper to "have held that use of a Taser to encourage compliance or to gain control over a potentially violent situation is permissible."  Chaney v. City of Orlando, FL, 291 F. App'x 238, 244 n.3 (11th Cir. 2008) (citing Draper, 369 F.3d at 1278).  Given the circumstances, Deputy Mills's use of a Taser to stop Illidge once he had entered his zone of safety was constitutionally reasonable.

The Graham factors continue to favor Deputy Mills's four subsequent uses of a Taser as Illidge's actions escalated.  After Illidge pulled out one of the Taser probes and walked away, Deputy Mills followed him toward the porch of the home at 1920 Pierce Road and used the Taser again only after it appeared Illidge was going to attempt to enter the home.  (Ex. A, Mills Aff. ¶¶ 5-7; Ex. TT, Mills Dash Cam. Vid. 5:19-5:37.)  Deputy Mills's use of the Taser at this point was appropriate because Illidge had previously entered a home and appeared to be trying to enter a home again.  Deputy Mills was unsure whether people were in the home, unsure whether the door was locked, and unsure what Illidge would do once inside the home.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about

the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-97. Accordingly, Deputy Mills's split-second decision to use the Taser rather than allow Illidge the opportunity to reach the door and enter the home was constitutionally reasonable under the totality of the circumstances. Illidge was an immediate threat to anyone who may have been in the home. Any subsequent uses on this basis were, likewise, reasonable because the Taser had been effective. It stopped Illidge from entering the house and brought him to the ground, at least momentarily, while Illidge resisted Deputy Mills's efforts to keep him pinned to the ground. (Ex. A, Mills Aff. ¶¶ 7, 9.)

Deputy Mills's use of the Taser was reasonable as Illidge's actions escalated into active resistance and assault. Illidge violently resisted and overpowered Deputy Mills with seemingly "superhuman strength" to the point that Deputy Mills feared and began to fight for his life. (Ex. A, Mills Aff. ¶ 9; Ex. W.) During the struggle with Deputy Mills, Illidge commits a Class C felony of assault in the second degree. Ala. Code § 13A-6-21(a)(4) (stating a person commits assault in the second degree if he or she "[w]ith intent to prevent a peace officer . . . from performing a lawful duty, he or she intends to cause physical injury and he or she causes physical injury to any person."[30] Additionally, Illidge's drug-fueled strength and violent resistance posed an immediate threat to Deputy Mills safety. Accordingly, Deputy Mills's decision to use the Taser to stop Illidge's violent resisting and in self-defense was constitutionally reasonable.

---

[30] Deputy Mills's bicep was torn during his struggle with Illidge. (Ex. A, Mills Aff. ¶¶ 13 15.) A "physical injury" is defined by statute as "[i]mpairment of physical condition or substantial pain." Ala. Code § 13A-1-2. Thus, Illidge's actions caused Deputy Mills a physical injury under the relevant statute. Illidge's actions also constituted a Class A misdemeanor for assault in the third degree. Ala. Code § 13A-6-22.

**2.      Deputy Mills and Deputy Smith's use of force at the 1866 Pierce Road home was constitutionally reasonable.**

All <u>Graham</u> factors continue to favor the use of force at the 1866 Pierce Road home. Deputy Smith's first use of his Taser occurred immediately after Illidge attempted to enter the Warr's home from their patio door and then turned and started towards the officers.[31]  At this point, Illidge had been actively fleeing from 1920 Pierce Road home.  Illidge had just recently physically assaulted Deputy Mills.  Illidge had recently committed multiple felonies and misdemeanors.  Illidge had already entered one home.  Illidge had attempted to enter two other homes.  Illidge's mental state was severely altered.  Illidge possessed extraordinary strength. Illidge was a danger to himself.  Illidge was a potential danger to everyone he encountered.  The officers had no choice.  Illidge had to be stopped.  When Deputy Smith fired his Taser, the prongs made contact with Illidge causing him to fall to the ground.  The Taser successfully, at least, momentarily, stopped Illidge.

During the struggle with Illidge, Deputy Smith's Taser was discharged a total of fifteen times.  (Ex. MM, Verified Report of Bryan Chiles – Pg 9.) [32]  At first, the raw total of fifteen may appear questionably high.  However, once the details of the X2 Taser event log are examined, the number of discharges becomes less significant because the discharges were short bursts, many 1 second or less, that were given over a short period of time.

---

[31] As discussed above, Deputy Mills did not use his Taser 1866 Pierce Road home.

[32] In reviewing the X2 Taser event log on pages 13-14, it should be noted that sequence numbers 749, 751, 765, 766, and 768 contain operational events a do not represent instances where the Taser was discharged.  (Ex. MM, Verified Report of Bryan Chiles – Pgs 15-29.)

The X2 Taser event log shows the following details:

> Discharge 1 (Seq. #750) lasted 5 seconds in duration.
> Discharge 2 (Seq. #753) lasted 1 second in duration.
> Discharge 3 (Seq. #754) lasted 3 seconds in duration.
> Discharge 4 (Seq. #755) lasted 2 seconds in duration.
> Discharge 5 (Seq. #756) lasted 1 second in duration.
> Discharge 6 (Seq. #757) lasted 4 seconds in duration.
> Discharge 7 (Seq. #758) lasted 6 seconds in duration.
> Discharge 8 (Seq. #759) lasted 1 second in duration.
> Discharge 9 (Seq. #760) lasted 1 second in duration.
> Discharge 10 (Seq. #761) lasted 1 second in duration.
> Discharge 11 (Seq. #762) lasted 5 seconds in duration.
> Discharge 12 (Seq. #763) lasted 5 seconds in duration.
> Discharge 13 (Seq. #764) lasted 4 seconds in duration.
> Discharge 14 (Seq. #767) lasted 3 seconds in duration.

(Ex. MM, Verified Report of Bryan Chiles – Pgs 13-14.)[33]  Thus, the Taser event log shows that 1/3 of the Taser discharges had a duration of 1 second or less;[34] 2/3 of the discharges had a duration of 4 seconds or less; and the longest duration was a single discharge lasting less than 6 seconds. Accordingly, the discharges of the Taser consisted of multiple short bursts. Additionally, the Taser logs show that the discharges occurred over a short period of time, 2 minutes and 16 seconds.[35]  Accordingly, Deputy Smith's Taser use consisted of short bursts

---

[33] According to the event log, the sum total of the X2 Taser discharges equals 42 seconds. However, the more accurate sum total, taken from the pulse log, is 37.2 seconds. (Ex. MM, Verified Report of Bryan Chiles – Pg 30.) The reason for this difference is that discharge duration times in the event log are rounded up to the nearest second while duration times taken from the analysis of the X2 pulse logs are accurate to 1/10th of a second. (Ex. MM, Verified Report of Bryan Chiles – Pg 14.) The event log rather that the pulse log has been used in this brief for the purpose of clarity as it is easier to read.

[34] For example, the event log shows that sequence 756 had duration of 1 second, but the pulse graph, accurate to 1/10th of a second, demonstrates that the duration was less than 0.4 seconds. (Ex. MM, Verified Report of Bryan Chiles – Pgs 13, 19.)

[35] Taser log sequence numbers 750 and 767 show the first discharged occurred at 19:51:01 and last discharge occurred at 19:53:17 (Ex. MM, Verified Report of Bryan Chiles – Pg 9.)

over a short duration of time.[36]  When the Taser did not have its intended effect, Deputy Smith

set it aside and proceeded to assist Deputy Mills and Officer Butler with handcuffing Illidge.

Deputy Smith testified that during the struggle to contain Illidge, his Taser unknowingly

fired the prongs a second time, which he did not realize until after he set his Taser down to assist

Deputy Mills and Officer Butler. (Ex. B, Smith Aff. ¶ 8.)[37]  The X2 Taser logs show that the

accidental discharge of the second prong cartridge occurred at Discharge 11 (Seq. #762).

(Ex. MM, Verified Report of Bryan Chiles – Pg 27.)  Accordingly, the last four discharges of the

Taser, consisting of 40% of the overall Taser discharge time, were not even intentional.  Taking

into account only Deputy Smith's intentional Taser use, he discharged the Taser a total of 10

times, ½ of the discharges having a duration of 1 second or less, and a total duration of all

charges was less than 25 seconds.

Notably, Plaintiff has a causal issue in proving that the use of Tasers contributed to

Illidge's death because he went into arrest approximately 23 minutes after the last time Deputy

Smith's Taser was discharged.  Deputy Smith's Taser log shows that the last discharge occurred

at 19:53:20.  (Ex. MM, Verified Report of Bryan Chiles – Pg 14.)[38] At approximately 20:16:49,

---

[36] Additionally, the pulse log shows of the X2 shows that Deputy Smith never used his Taser in
drive stun mode. (Ex. MM, Verified Report of Bryan Chiles – Pg 30.) Taser drive stun mode
only causes the subject localized pain and is designed to encourage compliance. (Ex. MM,
Verified Report of Bryan Chiles – Pg 8.) In probe mode, the purpose is to disable the subject
overriding the signals of the sensory and motor nervous systems. Accordingly, Deputy Smith
sought to disable and stop Illidge rather than merely seeking pain compliance.

[37] Deputy Smith's X2 Taser contains two bays each containing a deployable cartridge. (Ex. MM,
Verified Report of B. Chiles – Pgs 9-10.) Thus, he did not have to reload a cartridge for the
prongs to deploy a second time.

[38] Radio dispatch recordings show that Deputy Mill, (radio id. #66), requesting an ambulance at
20:02:04, less than 9 seconds after the last Taser discharge. (Ex. UU, 3-24-13_20_02_04; Ex.
VV, Aff. Jason Black.)  The ambulance run sheet reflects that it received the phone call at
20:04.  (Ex. SS, Ambulance Run Sheet.)

approximately 23 minutes after the last discharge, a voice can be heard over radio traffic that Illidge has stopped breathing, "Get their asses here now!"  (Ex. OO, Log of Lee County Sheriff's Office CAD Reports; Exhibit PP, Log of Phenix City Police Department CAD Reports; Ex. VV, 3-24-2013_09.16.19.6p (note Phenix City is on Eastern time)).

Unlike the allegations in the Complaint, Deputy Smith only used his Taser before Illidge was handcuffed and while he was violently resisting.  The Eleventh Circuit has upheld Taser use on a handcuffed arrestee who by comparison was far more compliant than Illidge.  See Buckley v. Haddock, 292 F. App'x 791, 795 (11th Cir. 2008) (stating that the arrestee "was not bound at the feet (so, he could both run and kick), he was moving around on the ground alongside a busy road, and he would not comply with the deputy's repeated instructions to stand up and to move to the patrol car where Plaintiff could be confined").  Thus, Deputy Smith's Taser use was reasonable under the Fourth Amendment.

Deputy Mills and Deputy Smith's use of force in holding Illidge down while attempting to secure him was, likewise, reasonable.  This Court previously dismissed an identical excessive claim against Deputy Jenkins for piling on and adding his weight to the other officers on top of Illidge.  The Court held that qualified immunity applied because it could not conclude that "Jenkins pil[ing] his weight on Illidge with other officers is a violation of clearly-established law.  (Doc 55 - Pg 8) (citing see Gennusa v. Canova, 748 F.3d 1103, 1113 (11th Cir.2014) (stating "[w]e do not always require a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate."); see also Merricks v. Adkisson, 785 F.3d 553 (11th Cir. 2015) (explaining in a case in which the officer did not beat, strike, or kick the plaintiff and the only force applied was "two yanks to get her out of the driver's seat," that the plaintiff did not prove

that the use of force was far beyond the hazy border between acceptable and unconstitutional force.))  This Court should likewise for Deputies Mills and Smith.

In this case, the evidence unanimously shows that Mills and Smith merely used their weight to hold Illidge and secure him.  Deputy Smith assisted in putting Illidge in leg irons and using three sets of linked flex cuffs from the chain of the leg irons to the handcuffs to limit his mobility and ability to kick at the officers.[39]  There is no evidence that the officers hit, kicked or otherwise abused Illidge.  As Gloria Warr observed at her home, she never saw any of the officers "strike, kick or abuse this man in any manner;" instead, [t]he officers were making great efforts to simply place the man in custody."  (Ex. P, Warr Dec. ¶ 5.)

## B.    Deputy Mills and Deputy Jenkins did not fail to intervene in an unreasonable use of force.

This Court's previous memorandum opinion granting in part and denying in part Deputy Jenkins's motion to dismiss, (Doc 55), demonstrates that he is entitled to summary judgment.  In denying Deputy Jenkin's motion to dismiss the failure to intervene claim, this Court noted that "under the facts plead, Jenkins jumped on a pile with officers adding his body weight while Illidge was tased multiple times and after prolonged tasering Jenkins finally got up from Illidge, but it was too late."  (Doc 55 - Pgs 8-9.)  This Court then explained the basis of its denial as follows:

> Under the facts as pled, this case is not one in which it is merely alleged that an officer failed to intervene when he arrived at a scene, but instead is one in which it is alleged that at some point after the officer arrived, it was apparent to the officers on the scene that the suspect stopped struggling, but the Defendant officer did not intervene to stop the repeated use of a TASER on the non-struggling suspect.

(Doc 55 - Pg. 9.)

---

[39] Deputy Mills only assisted in handcuffing Illidge and was relieved due to exhaustion by other officers before Illidge was placed in leg shackles.

The actual facts of this case fall far short of meeting the alleged facts of the Complaint. First, Deputy Jenkins testifies that Illidge was not tased in his presence.  (Ex. C, Jenkins Aff. ¶ 8.)  Second, testimonial evidence in total demonstrates that Deputy Jenkins did not arrive until after Deputy Smith stopped using his Taser.  To explain, Deputy Smith testifies that he set down his Taser to assist Deputy Mills and Officer Butler in handcuffing Illidge and that he did not use the Taser again after setting it down.  (Ex. B, Smith Aff. ¶ 8.)  Eyewitness accounts of the officers present consistently place Deputy Jenkins arrival at the scene after Illidge was secured in handcuffs.  (Ex. C, Jenkins Aff. ¶ 5; Ex. B, Smith Aff. ¶¶ 9-10; Ex. E, Butler Aff. ¶¶ 8-10; Ex. F, Sheely Aff. ¶¶ 4-5.)  Liability based upon a theory of failure to intervene can only apply if "the defendant officer was in a position to intervene."  Dukes v. Miami-Dade County, 232 F. App'x 907, 913 (11th Cir. 2007).  Because Deputy Jenkins was not present when Deputy Smith used his Taser, he cannot be held liable for failure to intervene in its use.

Deputy Mills is, likewise, entitled to summary judgment on the failure to intervene claim. Assuming, arguendo, Deputy Smith was not entitled to qualified immunity on his Taser use, Deputy Mills would still be entitled to qualified immunity.  As Deputy Mills explains, during the struggle Illidge continued flailing his arms and kicking at the officers.  Due to the struggle and his exhaustion, Deputy Mills was unaware that Deputy Smith used his Taser during the struggle but noted even "[i]f he did, it had no effect on Illidge."  (Ex. A, Mills Aff. ¶ 12.)  Accordingly, Deputy Mills was not in a position to intervene nor did he have any reason to believe there was a need to intervene.

### C.    **Deputies Mills, Smith, and Jenkins actions did not violate clearly established law.**

A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v.

Creighton, 483 U.S. 635, 640 (1987).  Because Defendants have raised the defense of qualified immunity, Plaintiff bears the burden of demonstrating a violation of clearly established law in either of two ways.  First, a plaintiff can point to a case with materially similar facts holding that the conduct engaged in was illegal.  Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003).  Second, in absence of case law, a plaintiff must demonstrate that a pertinent federal statute or constitutional provision is specific enough to demonstrate their conduct was illegal. Storck, 354 F.3d at 1317.  The Eleventh Circuit has identified this method as an "obvious clarity" case.  Vineyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002).  Under this test, the law is clearly established, and qualified immunity overcome, only if the body of then-existing law would "inevitably lead every reasonable officer in [the defendant's] position to conclude that the force was unlawful." obvious to all.  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000).  Put differently, the facts of this case must be "so far beyond the hazy border between excessive and acceptable force [that every reasonable officer] had to know he was violating the Constitution without case law on point." Vinyard, 311 F.3d at 1355.

Generally, "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."  Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."  Storck, 354 F.3d 1307, 1318 (11th Cir. 2003).  "[U]nless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity."  Priester v. City of Riviera Beach, 208 F.3 919, 926 (11th Cir. 2000).  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court,

Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose," here, the Alabama Supreme Court.  Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Storck, 354 F.3d at 1318.  Under the facts of this case, Plaintiff cannot demonstrate any of the Defendants' acts violated clearly established law.

The case of Mann v. Taser Int'l, Inc., 588 F.3d 1291 (11th Cir. 2009), demonstrates that Deputies Mills, Smith, and Jenkins actions did not constitute a violation of clearly established law.  In Mann, after smoking methamphetamine, an agitated and delusional woman entered a neighboring house claiming to be her own, accused the neighbors of stealing her things, and began ransacking the house.  588 F.3d 1291, 1298-99 (11th Cir. 2009).  Responding to a call, deputies found the woman, in a state later to be determined as excited delirium, wandering in a backyard, screaming, and claiming demons had stolen her treasure.  Mann, 588 F.3d at 1299. Although initially cooperative with her arrest, when the deputies attempted to handcuff her, the woman started screaming and became combative.  Id.  The deputies were able to handcuff the woman and due to her size had used two sets of linked handcuffs.  Id. at 1299-1300.  Due to her combativeness the deputies had not searched her prior to placing her in a squad car, but the woman's greater range of motion allowed her to reach into her pockets prompting the deputies to remove her from the car to search her.  Id. at 1300.

Outside the car, the woman began shouting, resisting the deputies, slamming her head against the trunk of the car, and flailing her body trying to hit, kick, head butt, and spit on the deputies.  Mann, 588 F.3d at 1300.  Once placed back into the car, the woman began to kick

uncontrollably with such force that she propelled herself out an open door and landed on her head and neck.  Id.  Because the woman continued to kick and fight the deputies, they placed leg shackles on her before again returning her to the car.  Id.  Despite the leg shackles, the woman continued to kick eventually kicking out the rear driver's side window, shattering the glass and bending the steel door frame.  Id.

Despite the deputies instructions to stop, the woman continued kicking and slamming her head up against the opposite door.  Mann, 588 F.3d at 1300.  One of the deputies discharged his Taser three times but it did not have the intended effect as she continued her aggressive resistance.  Id.  The first discharge had only a momentary effect while the second and third discharge had no effect, leading the deputies to question whether the device was working properly likely caused from one of the probes coming loose during the struggle.  Id.  During her transport to the jail, the woman continued to be combative until shortly before arriving at the jail. Id.  A short time later, she was transported to the hospital where she died.  Id.  at 1300-01

Upon review, the Eleventh Circuit held that the deputies' use of force was reasonable under the Fourth Amendment because the woman had "actively resisted the deputies' efforts at effectuating a lawful arrest and refused to comply with their requests. Her behavior was violent, aggressive and prolonged and the evidence demonstrates that she was clearly a danger to herself and others."  Mann, 588 F.3d at 1306.  "The nature and quality of the intrusion here, namely use of a Taser, was appropriate given the countervailing government interest of safety and compliance."  Id.  In this case, Illidge had, likewise, acted violently, aggressively, refused to comply with the officers' requests, and was a danger to himself and to others.  Accordingly, none of the officers violated clearly established law.

## II.   SUMMARY JUDGEMENT IS DUE ON ALL SUPERVISORY LIABILITY CLAIMS AGAINST SHERIFF JONES.

As an initial matter, supervisory officials cannot be held liable under § 1983 in the absence of an underlying constitutional violation.  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (stating "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point").  In Cagle v. Sutherland, the Eleventh Circuit held an Alabama sheriff could not be held liable based upon his status as a supervisor for failure to train jail staff properly on suicide prevention measures where "no underlying constitutional violation exists."  334 F.3d 980, 988-89 (11th Cir. 2003).  Accordingly, should this Court grant summary judgment on the claims against Deputies Mills, Smith, and Jenkins, Sheriff Jones is, likewise, entitled to summary judgment.

### A.   Plaintiff cannot meet her evidentiary burden to establish a supervisory-liability claim against Sheriff Jones because no evidence exists he had any notice of County law enforcement officials engaging in improper use of Tasers.

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.1999).  In Ashcroft v. Iqbal, the Court stated "In a § 1983 suit . . . – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  556 U.S. 662, 677 (2009).  Supervisors can be held liable where they directly participated in the unconstitutional conduct."  Keith v. DeKalb County, Georgia, 749 F.3d 1034, 1047-48 (11th Cir. 2014); see also Iqbal, 556 U.S. at 677.  In this case, however, there is no evidence and it has

never been alleged that Sheriff Jones directly participated in the incidents giving rise to the Plaintiff's claims.

Alternatively, supervisory officials can be held liable under § 1983 for subordinates' constitutional violations on the basis of supervisory liability "when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.2003)). However, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Cottone, 326 F.3d at 1360-61. A causal connection may be established under the three following circumstances: evidence of (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," (2) the supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights," or (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone, 326 F.3d at 1360.

To meet his burden against Sheriff Jones as policymaker, Plaintiff must point out a policy that actually caused the harm. "[A] prerequisite for establishing a § 1983 claim based on an allegedly unconstitutional policy or custom is a showing that the policy actually resulted in a violation of the plaintiff's constitutional rights." Johnson v. Whitman, No. 6:14-CV-00704-LSC, 2015 WL 3385153, at *7 (N.D. Ala. May 26, 2015) (citing see Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir.1996)). Additionally, Plaintiff must show that Sheriff Jones had subjective knowledge that the policy posed a risk of serious harm. See Williams v. Limestone County, 198 F. App'x 893, 897 (11th Cir. 2006) (finding that a sheriff was not deliberately indifferent as a

policymaker, because "there [was] no indication [that he] had notice his policies, training procedures, or supervision were 'likely to result in the violation of a constitutional right'") (citing Belcher v. City of Foley, 30 F.3d 1390, 1397-98 (11th Cir. 1994)).

Because officials rarely will have an official policy that endorses a constitutional violation, plaintiffs ordinarily "must show that the [official] has a custom or practice of permitting it and that the [official's] custom or practice is 'the 'moving force [behind] the constitutional violation.'" Grech v. Clayton County, Ga., 335 F.3d 1326, 1330 (11th Cir. 2003) (last alteration in original) (citations omitted). "A custom is a practice that is so settled and permanent that it takes on the force of law." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). Under this theory of liability, "[a] pattern of similar constitutional violations . . . is 'ordinarily necessary.'" Craig v. Floyd County, Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (citing Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1360 (2011).

Plaintiff's supervisory liability claim based upon the alleged failure to train, likewise, requires evidence of a pattern of similar violations. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, , 563 U.S. 51, 62 (2011) (citing Bd. of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 418 (1997)). Such a restriction is "indispensable," otherwise, "'failure to train' would become a talismanic incantation producing municipal liability "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee. Connick, 563 U.S. at 74 (Scalia, J. concurring). "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. at 62.

In this case, Plaintiff fails to meet her evidentiary burden of showing evidence that Sheriff Jones had sufficient notice that his subordinates were misusing Tasers.  In regards to training, the evidence demonstrates that Sheriff Jones has a certification program in place that requires taking a specific number a classroom hours; taking a written exam and receiving a passing grade of 90%; taking a practical exam, which includes receiving a burst from a Taser; and annual recertification.  (Ex. D, Jones Aff. ¶¶3-5.)  Regarding supervision of Taser use, Sheriff Jones requires deputies who use a Taser prepare a written report; submit the report to their immediate supervisor; review of the report, the circumstances of the use of force, and video of the incident, if available, by the shift supervisor; and then the use of force reports and review are forwarded to Sheriff Jones through the chain of command.  (Ex. D, Jones Aff. ¶ 10.)

In the Second Amended Complaint, Plaintiff alleged that Sheriff Jones had notice of widespread unconstitutional Taser use by citing to twenty incidents of supposed improper use.  (See Doc 40 ¶ 48.)   Interestingly, five of the twenty incidents occurred after the incident involving Illidge.  (Ex. D, Jones Aff. ¶ 19 p-t.)  Accordingly, those incidents are inapplicable.  Additionally, one of the twenty incidents is the one involving Illidge.  However, even assuming *arguendo* Sheriff Jones's subordinates had acted improperly, a single incident cannot raise the purported policy or custom at issue to the level of deliberate indifference.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (plurality opinion) (holding that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation").

More importantly, once the instances of Taser use are examined and the conclusory language of the Second Amended Complaint is stripped away, these instances fail to demonstrate

improper Taser use.  To the contrary, these instances show appropriate Taser use, that that use of Taser saved lives, that use of Tasers has all but eliminated the use of "hands on" techniques, and the dangers that law enforcement officers face in performance of their duties.  (Ex. D, Jones Aff. ¶ 20.)  The evidence simply fails to show that Sheriff Jones has improperly supervised use of force, including Taser use, by deputy sheriffs.  Instead, the evidence demonstrates Sheriff Jones conducts a model program for Taser use in regards to training, discipline, and supervision.

The case of Mathews v. Crosby, 480 F.3d 1265 (11th Cir. 2007), illustrates the extent of evidence that must be present to hold a supervisor liable based upon a theory of unconstitutional policies and customs.[40]  In Mathews, shortly after arriving at prison, a plaintiff was repeatedly beaten by prison guards and suffered injuries including a fractured jaw in a section of the prison called X-wing.  Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007).  The plaintiff told an on-site inspector who in turn informed a supervisory defendant, Warden Crosby, about the repeated beatings.  Mathews, 480 F.3d at 1270.  The plaintiff's mother also informed Warden Crosby that he received a letter from a corrections officer stating that the plaintiff was being abused by guards.  Id.  Plaintiff filed an emergency grievance stating he was in fear for his life following multiple beating from guards in X-wing and was suffering from an untreated broken jaw.  Id.  Two days later, after another inmate in X-wing was repeatedly beaten and killed by guards, the plaintiff was transferred from X-wing and surgery was performed.  Id. at 1271.

Prior to the plaintiff's beatings, Warden Crosby had been specifically warned by the former warden about certain guards who the former warden believed were abusive towards

---

[40] In Valdes v. Crosby, 450 F.3d 1231, a case also arising from Warden Crosby's tenure as warden at the same penitentiary by the estate of an inmate who died after a beating by prison guards, the Eleventh Circuit came to the same conclusion as it did in Mathews. However, since the facts in both cases occurred contemporaneously, under the same prison conditions, and under Warden Crosby's tenure, the Eleventh Circuit's analysis regarding Warden Crosby's liability under a theory of supervisory liability is nearly identical.

inmates and should be kept out of high profile areas such as X-wing. Mathews, 480 F.3d at 1271. The former warden warned Warden Crosby that he was "afraid they would kill an inmate" and even left Crosby a list of the guards' names. Id. The former warden had also hired an assistant warden who had been "aggressively helping fight the excessive use of force in the prison," but shortly after receiving his position, Warden Crosby transferred the assistant warden to another facility. Id. at 1272.

The former warden testified that he specifically informed Warden Crosby about a guard named Thorton who he believed was "extremely dangerous" and was believed to have overseen the severe beating of an inmate in X-wing. Id. at 1271. The former warden had transferred Thorton out of X-wing and away from other areas where he believed Thorton might have opportunities to abuse inmates. Id. Despite this knowledge, the Warden Crosby promoted Thorton and transferred him back to X-wing. Id. Evidence further showed that Warden Crosby was instrumental in bringing in an officer named Lucas who had a history of using excessive force against inmates and had been documented in an investigative report for teaching trainees improper practices such as taking "free shots" at inmate while handcuffed, using chemical agents without proper notice, reviewing medical reports prior to completing use-of-force reports to ensure conformity, and teaching which areas of the human body could be kicked without leaving boot prints. Id.

Prior to Crosby's tenure, wardens had required cell extractions to be videoed as a method to cut down on problems during use of force. Id. at 1273. Warden Crosby, however, discontinued the practice of videoing cell extractions. Id. Under prison procedures, copies of abuse-of-force complaints forwarded to the warden. Id. Evidence was submitted that although abuse-of-force complaints had been forwarded to him, Warden Crosby simply did not review

then.  Id. at 1274.  Included in the unread complaints and inquires sent to Warden Crosby were numerous references to guards threatening to kill inmates, malicious harassment, and various forms of abuse.  Id. at 1274-75.  A prison chaplain testified that after Crosby because warden, he was prevented from seeing inmates following uses of force and beatings and cover-ups increased under Warden Crosby's "hands-off approach." Id. at 1274.

Under this abundance of evidence, "when taken together," the Eleventh Circuit concluded that the evidence was "adequate to entitle [the plaintiff] to proceed to trial and show that inmate abuse at the hands of guards was not an isolated occurrence, but rather occurred with sufficient regularity as to demonstrate a history of widespread abuse." Mathews, 480 F.3d at 1275.  The Court also concluded that such evidence was "sufficient to allow a jury to consider whether Crosby had established customs and policies that resulted in deliberate indifference to constitutional violations and whether Crosby failed to take reasonable measures to correct the alleged deprivations." Id.

In light of Mathews, Plaintiff's evidence in support of her supervisory liability claims against Sheriff Jones is profoundly underwhelming.   "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Keith v. DeKalb County, Georgia, 749 F.3d 1034, 1048 (11th Cir. 2014).  The evidence fails to meet the extremely rigorous standard for holding a supervisory liable for the actions of a subordinate.  Sheriff Jones is entitled to summary judgment.

### B. Plaintiff cannot meet her burden of showing that Sheriff Jones violated clearly established law.

Just as Plaintiff must establish that Deputies Mills, Smith, and Jenkins's actions constituted a violation of clearly established law, Plaintiff must, likewise, prove Sheriff Jones's

actions as a supervisor somehow constituted a violation of clearly established law.  The cases of Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.2003), and Danley v. Allen, 540 F.3d 1298 (11th Cir. 2008), establish the amount of evidence required to hold officials liable based upon their status as supervisors.[41]  In Cottone, the Eleventh Circuit Court of Appeals held supervisory liability claims insufficient as a matter of law because although the complaint alleged that the supervisory defendants were on "notice of widespread unconstitutional conduct by guards," the pleading failed to allege "'any specific facts at all'" showing that "the supervisors had *knowledge* of the guards' failure" in monitor inmates.  Danley v. Allen, 540 F.3d 1298 (11th Cir. 2008) (emphasis added) (citing Cottone, 326 F.3d at 1361).  The Eleventh Circuit subsequently explained, "[b]ecause the complaint in Cottone failed to allege that the supervisors were on notice of the guards' unconstitutional conduct, it did not adequately allege that they were aware of a need to correct it."  Danley, 540 F.3d at 1314 (citing Cottone, 326 F.3d at 1361-62).

In Danley, conversely, the Eleventh Circuit held that a supervisory liability claim was plausibly sufficient where it was alleged the supervisors "had knowledge through "force reports and similar documents, inmate complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation" that jailers were abusing use of pepper spray and denying inmates medical treatment after its discharge."  Danley, 540 F.3d at 1315.  The allegations further stated that despite "numerous *known* incidents," the supervisors took no action.  Id.

In this case, there is no evidence of a single prior incident let alone "numerous known incidents.  The facts of this case are nowhere near equivalent to the allegations brought in Cottone and thus are far removed from the allegations brought in Danley.  In the light of Mathews, Cottone, and Danley, Plaintiff cannot meet her burden of showing a violation of

---

[41] Both Cottone and Danley were decided under Rule 12(b)(6) rather the Rule 56, but the law is nonetheless applicable.

clearly established law.

## **CONCLUSION**

Based upon the aforementioned, Defendants request this court grant them summary judgment.

Respectfully submitted this 6th day of June, 2016.

**s/Fred L. Clements Jr.**

J. RANDALL McNEILL (MCN007)

FRED L. CLEMENTS, JR. (CLE044)

WEBB & ELEY, P.C.

7475 Halcyon Pointe Dr. (36117)

Post Office Box 240909

Montgomery, Alabama  36124

(334) 262-1850 T   (334) 262-1772 F

rmcneill@webbeley.com

fclements@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Samuel Fisher, Esq.
Sidney Jackson, Esq.
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, AL 35203
sf@wigginschild.com
sjackson@wigginschild.com

Peter M. Williamson, Esq.
WILLIAMSON LAW FIRM
20750 Ventura Blvd., Suite 245
Woodland Hills, CA 91364
pmw@pwilliamsonlaw.com

James R. McKoon, Jr., Esq.
Glenn Channing Gamble, Esq.
MCKOON & GAMBLE
Post Office Box 3220
Phenix City, Alabama  36868-3220
jrmckoon@aol.com
chan@mckoonandgamble.com

**s/Fred L. Clements Jr.**
OF COUNSEL