IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GLADIS CALLWOOD, as Administratrix of the Estate of KHARI NEVILLE ILLIDGE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:15CV182-WHA |
| PHENIX CITY, ALABAMA, a municipal corporation; JAY JONES, individually; CHARLES W. JENKINS, JR, individually; STEVEN M. MILLS, individually; RAY SMITH, individually; JOEY WILLIAMS, individually; DAVID BUTLER, individually; SHAWN SHEELY, individually; and RAYMOND J. SMITH, individually, | ) ) ) ) ) ) ) ) ) ) ) | (wo) |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by Defendants

David Butler, Phenix City, Shawn Sheely, Raymond J. Smith, and Joey Williams (Doc. #76); a

Motion for Summary Judgment filed by Charles W. Jenkins Jr., Jay Jones, Steven M. Mills, and

Ray Smith (Doc. #79); a Motion to Strike Paragraphs 3, 4, and 5 of the Declaration of Gloria

Warr filed by Gladis Callwood ("Callwood") (Doc. #111); a Motion to Amend/Correct filed by

Callwood (Doc. #112); a Motion to Strike filed by Callwood (Doc. #114); and a Motion to Strike

filed by the Defendants (Doc. #132).

For the reasons to be discussed, the Motions to Strike are due to be GRANTED or

DENIED, the Motion to Amend/Correct Motion is due to be GRANTED, and the Motions for

Summary Judgment are due to be GRANTED as to the federal claims and the court will decline

to exercise supplemental jurisdiction over the state law claims.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and    . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56 (c)(1)(A),(B).   Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*,

477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).

### III.   FACTS

The facts before the court, construed in a light most favorable to the Plaintiff, are as

follows:

The Plaintiff, Callwood, is the Administratrix of the Estate of Khari Illidge ("Illidge").

The case arises out of the tragic death of Illidge in Lee County, Alabama arising out of his arrest

by the Defendant law enforcement officers.   Claims have been brought in this case against Lee

County Defendants including the Lee County Sheriff Jay Jones and Lee County Sheriff Deputies

Steven M. Mills, Ray Smith, and Charles Jenkins, Jr.   Claims have also been brought against

Phenix City Defendants including the City of Phenix City, Police Chief of the City of Phenix

City Raymond Smith, and police officers David Butler, Joey Williams, Shawn Sheely.

On March 24, 2013, Illidge was with his friend Nicholas Woodham when he began acting

strangely. Illidge ran into Woodham's yard, took off all of his clothes, and began walking down

the road. Illidge arrived at Woodham's parents' home, and then walked across the road.   Leigh

Ann Woodham arrived home, learned of the situation, and called 911 to report it. There is some

question as to whether at that point, or at a later point, someone suggested to Mr. and Mrs.

Woodham that Illidge had taken LSD.

At around 6:45 p.m., Defendants Lee County, Alabama Deputy Sheriff Steven Mills

("Mills") and Deputy Sheriff Ray Smith ("Ray Smith"),[1] who were on patrol in separate vehicles, received dispatch calls about a report of a naked, black man running down Lee County Road 314. They began to look for the person.

Mills stated in an affidavit that he then received a second dispatch call that a naked, black man had been in or at someone's home. (Doc. #81-1 at ¶3; Doc. #134-1 at p.81:16-22). Ray Smith similarly stated in an affidavit that he received a second dispatch call at 7:45 p.m. regarding a naked, black man entering a house on Lee County Road 308 and heard Mills over the radio responding to that call. (Doc. #81-2 at ¶4). Callwood states that these facts are disputed, stating that there is evidence that Mills did not have knowledge of or details regarding Illidge entering a residence.   The evidence Callwood cites to is Mills' statement "[t]hey said he'd been at a residence, but I didn't have any details on that." (Doc. 144-33 at p. 21:11-15).[2] Evidence that Mills did not know the details of Illidge entering the residence, however, does not refute that he received the dispatch that Illidge had been at someone's home.

Mills' initial encounter with the naked person, whom he later learned was Illidge, was captured on the dashboard camera video of Mills' patrol vehicle where a naked man is seen walking away from Mills (Doc. #85, Exhibit TT).   During this time, Mills radioed dispatch that Illidge is 10-96 (mentally ill) and possibly 10-77 (under the influence). Some of the encounter is visible, and there is audio.   The video reveals that it was dark outside at that time. Mills can be heard calling to Illidge and Illidge walked away from Mills. Mills exited his vehicle to follow

---

[1]  The court will refer to Lee County Sheriff Deputy as "Ray Smith" and Phenix City Police Chief as "Raymond Smith."

[2]  The court has referred to cited deposition testimony by the court's CM/ECF document number, but the internal page and line numbers from the depositions.

Illidge and Illidge said "excuse me, out of the way" as he was walking toward Mills.

Mills stated in his affidavit that at that point, which is out of the view of the camera, Illidge began walking toward Mills and entered his zone of safety. (Doc. #81-1). Mills said that he would taser Illidge, but Illidge continued walking. Mills shot Illidge with his X26 Taser. Mills stated in his affidavit that Illidge was between three and five feet of him at that time. Mills states that Illidge did not drop to the ground after being tased and began walking away. (Doc. #81-1). Illidge then turned toward the porch of the home at 1920 Pierce Road.   Mills touched Illidge's side with the Taser in drive stun mode.[3] Illidge then fell to the ground and Mills attempted to pin him.

Mills stated in his affidavit that Illidge overpowered him and was able to lift up off the ground with Mills on him. (Doc. #81-1 at ¶9). Mills struck him with the Taser several times. Mills also states that Illidge grabbed him and slung him at least 10 feet. (Doc. #81-1 at ¶9).

The Defendants present the download logs from Mills' Taser and state that Mills discharged the Taser five times. Mills radioed dispatch and asked for assistance.

Mills spotted Illidge heading toward another resident at 1866 Pierce Road.   Mills saw Illidge climb a barbed wire fence.   Ray Smith arrived on the scene and the two followed Illidge, yelling for Illidge to stop.   Ray Smith believed that Illidge may have been suffering from Excited Delirium. (Doc. #81-2).

Illidge went to the rear of the home at 1866 Pierce Road, the home of Dr. Charles and

---

[3] Tasers can be used in two modes, one is dart or prong mode in which a barbed point makes contact with the skin and the other is drive or dry stun mode in which the electrified tips of the Taser are touched to the skin directly. *Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012); (Doc. #106-1). A Taser is set to cycle for five seconds. The cycle can be ended sooner than five seconds. (Doc. #106-1).

Gloria Warr with Mills and Ray Smith following him.    Phenix City Police Officer David Butler ("Butler") also arrived at the home of the Warrs. The deputies told Illidge to get on the ground, but he did not comply. (Doc. #81-5 at ¶4). Ray Smith stated in an affidavit that Illidge turned toward them in a hostile manner, (Doc. #81-2 at ¶7), and Butler characterized it in his affidavit as a "rapid and aggressive move." (Doc. #81-5 at ¶4). In an interview with the Alabama Bureau of Investigation ("ABI"), Butler stated that Mills and Ray Smith instructed Illidge to stop and get down on the ground, but he walked to the house instead, shook the door knob, they instructed him to stop right there, he began walking away, and then made a rapid movement toward Ray Smith. (Doc. #134-4 at p.46).

Ray Smith applied a Taser to Illidge and Illidge fell to the ground on his stomach. Mills and Butler applied their weight to Illidge in an attempt to place handcuffs on him. Smith used his Taser several additional times but Illidge continued to move. In total, Ray Smith used the Taser fourteen times. The use of the Taser fourteen times is not consistent with its use as presented in law enforcement training.

Callwood relies on Butler's deposition testimony in support of her timeline for the use of the Taser. In the portion cited by Callwood, which was transcribed from an oral statement given by Butler to ABI Investigator Arrington and played during Butler's deposition and acknowledged by Butler as being truthful, Butler states as follows:

> 18 INVESTIGATOR ARRINGTON: Okay.
> 19 So, Corporal Mills was able to get a cuff on
> 20 at one point?
> 21 OFFICER BUTLER: Yes, sir.
> 22 INVESTIGATOR ARRINGTON: Okay.
> 23 And Corporal Mills has got the left hand,
> 1 you've got the right hand, where is Deputy
> 2 Smith at?

3 OFFICER BUTLER: Deputy Smith
4 was still standing behind the individual.
5 INVESTIGATOR ARRINGTON: Okay.
6 Was Deputy Smith still controlling the TASER,
7 so to say?
8 OFFICER BUTLER: Yes. At that
9 point.
10 INVESTIGATOR ARRINGTON: Okay.
11 So if you don't know, tell me you don't know.
12 Was Deputy Smith controlling the TASER if the
13 individual needed more -- If he needed to use
14 the TASER more, was Deputy Smith doing that,
15 exerting --
16 OFFICER BUTLER: If he needed
17 it, but I'm not sure how the whole TASER
18 works.

(Doc. #106-15 at p.51:18-52-18).    The testimony continued as follows:

19 INVESTIGATOR ARRINGTON: Okay.
20 Okay. But you know that Deputy Smith is
21 holding the TASER, you and Corporal Mills are
22 on each side of his body trying to get an arm?
23 OFFICER BUTLER: Correct.
1 INVESTIGATOR ARRINGTON: Okay.
2 You say Corporal Smith got one arm and you
3 eventually got another arm?
4 OFFICER BUTLER: Yes.
5 INVESTIGATOR ARRINGTON: Okay.
6 And that's approximately -- As far as, I mean,
7 how long -- five minutes for the first arm
8 wrestle. How long would you say for the
9 second arm?
10 OFFICER BUTLER: Two or three
11 minutes.
12 INVESTIGATOR ARRINGTON: Okay.
13 So a total of seven minutes?
14 OFFICER BUTLER: Yes.
15 INVESTIGATOR ARRINGTON: So,
16 you're getting to the point where you were --
17 your almost physically spent, you're getting
18 tired?
19 OFFICER BUTLER: Yes, sir.
20 INVESTIGATOR ARRINGTON:

7

21 Corporal Mills is getting tired?
22 OFFICER BUTLER: Yes, sir.
23 INVESTIGATOR ARRINGTON: Okay.
1 What happens next? Do the individuals show
2 up?
3 OFFICER BUTLER: At that point,
4 we were able to get him into custody with his
5 right arm. And Corporal -- Deputy Smith used
6 a metal PR 24 and placed it in between his
7 handcuff, the subject's handcuff and his
8 spine.
9 INVESTIGATOR ARRINGTON: Okay.
10 And that was for leverage?
11 OFFICER BUTLER: Yes, sir.
12 INVESTIGATOR ARRINGTON: Okay.
13 In your opinion, was that strictly for
14 leverage?
15 OFFICER BUTLER: Yes.
16 INVESTIGATOR ARRINGTON: Was
17 there any use of force done with that PR 24 or
18 ASP, as you call it?
19 THE WITNESS: No, sir.
20 INVESTIGATOR ARRINGTON: So, it
21 was all for leverage?
22 OFFICER BUTLER: Yes.
23 INVESTIGATOR ARRINGTON: That
1 your opinion, that's normal; right?
2 OFFICER BUTLER: Yes.
3 INVESTIGATOR ARRINGTON: Okay.
4 So, at that point, Officer Sheely -- Did
5 anyone else from Phenix City show up?
6 OFFICER BUTLER: Darryl
7 Williams.
8 INVESTIGATOR ARRINGTON: Okay.
9 Sergeant Darryl Williams?
10 OFFICER BUTLER: Yes.
11 INVESTIGATOR ARRINGTON: Was he
12 there at that time?
13 OFFICER BUTLER: Yes.
14 INVESTIGATOR ARRINGTON: Okay.
15 What was he doing when --
16 OFFICER BUTLER: He replaced
17 Deputy Smith.

(Doc. 106-15 at p.52:19-61:17).

Ray Smith states in his deposition that they initially were unsuccessful in getting the handcuffs on Illidge and that Ray Smith had "re-energized the taser as he was coming up." (Doc. #134-2 at p.69:15-22).   In his affidavit, Ray Smith explains that he used the Taser several times while Butler and Mills were attempting to handcuff Illidge, and then he put down the Taser and assisted Mills and Butler as they pulled Illidge's arms close enough together to handcuff Illidge. (Doc. #81-2 at ¶8).

After the handcuffs were secured, Illidge continued to struggle, and got up and moved the officers.

Gloria Warr witnessed some of the interaction of the Defendants and Illidge. At around 9:00 p.m., Gloria Warr heard the sound of someone trying to open the back patio door and saw Illidge at the door. The Defendants rely on an affidavit version of her recollection, portions of which have been challenged and, as will be discussed below, the court has not considered. In her deposition, Gloria Warr stated that after she first saw Illidge at the back door, she went to retrieve her gun, and the next time she saw him, there were two or three officers "trying to subdue him at that time."   (Doc. #11-3 at p.50:10-18). Gloria Warr stated that Illidge was trying to go up the stairs and the officers were going with him. (*Id.* at p.51:1-6). Gloria Warr never saw Illidge being tased. (*Id.* at p.51:17-52:5). Gloria Warr stated that she heard the police officers tell Illidge numerous times to calm down, and that it was going to be all right. (Doc. #111-3 at p.61:16-23).

While the officers characterize Illidge as carrying the officers 20 feet, Callwood points to Gloria Warr's testimony on this point, which this court accepts for purposes of the Motion for

Summary Judgment, that it was like Illidge was still trying to move, the officers were trying to stop him, and Illidge was "just moving, going up the steps."   (Doc. #106-23 at p.52:14-17).

Phenix City Police Officers Shawn Sheely ("Sheely") and Joey Williams ("Williams") arrived on the scene.   Illidge was kicking, so Sheely was asked to find leg restraints, and left to do so.   Charles Jenkins, Jr. ("Jenkins") arrived with leg shackles and three flex cuffs and the officers affixed the leg irons. Three sets of linked flex cuffs were attached from the leg irons on Illidge to the handcuffs. (Doc. #81-3).

Williams placed a knee between Illidge's shoulder blades and another in the middle of Illidge's back, with his feet on the ground. Williams weighed 385 pounds at the time. Sheely was also restraining Illidge's legs.

Illidge suddenly became unresponsive. Twenty-three minutes had elapsed since the Taser was last used.

Illidge was turned on his side and Jenkins observed a white, frothy substance and blood coming from Illidge's nose and mouth.

Illidge was transported to a hospital by ambulance where he was pronounced dead.

An autopsy was performed on Illidge by a forensic pathologist and no LSD was discovered in Illidge's system post-mortem.

Defendants Jay Jones and Raymond J. Smith were not present at the scene, but claims were brought against them in their individual capacities on a theory of failure to train.[4]

---

[4] Raymond J. Smith in his individual capacity has been dismissed as a Defendant in this case. (Doc. #123).

## IV. DISCUSSION

Before the court can address the claims brought, and the grounds for summary judgment asserted as to those claims, there are evidentiary issues which have been raised in various motions to strike which must be addressed.

### Evidentiary Issues

The Plaintiff, Callwood, seeks to strike various paragraphs of the declaration of Gloria Warr and the affidavits of Norman Woodham and Leigh Ann Woodham. These individuals are third-party witnesses. As earlier noted, Gloria Warr is a homeowner who witnessed some of the interaction between Illidge and the Defendant officers. The Woodhams are parents of a friend of Illidge from whose home Illidge departed at the start of the events in question.

Callwood argues that Gloria Warr's Declaration was not prepared by her, and during her deposition, she testified that several passages in the Declaration were false and that she signed the Declaration only because she had been told that those passages would be removed before the Declaration was filed.

Specifically, Callwood points to paragraphs 3, 4, and 5 of Gloria Warr's Declaration which state that Illidge gestured and approached the officers and resisted their restraint and the officers attempted to perform CPR when Illidge stopped struggling. Callwood states that Gloria Warr testified in her deposition that she saw Illidge at the backdoor of her sunroom, but never saw him gesture with clinched fists, or approach the officers or struggle, and never saw them begin CPR.

With regard to the Declarations of the Woodhams, Callwood argues that their affidavits contain a false statement in paragraph four because they state that at the time Illidge left their

home, their son Nicholas told them that Illidge had consumed a hallucinogenic drug, but their depositions confirm that no one told Mrs. Woodham that Illidge had taken anything and Mr. Woodham stated that Nicholas told him he did not know if Illidge had taken something.

The Defendants essentially concede that the Declaration and Affidavits conflict with other testimony on the points identified and that the facts must be construed in a light most favorable to the non-movant. (Doc. #124 at p.8; Doc. #116 at p.7). For purposes of the Motion for Summary Judgment, therefore, the court will not consider the portions of the Declaration and Affidavit statements of Warr and the Woodhams contradicted by other evidence, and the Motions to Strike are due to be GRANTED.

The Defendants also jointly move to strike Exhibits 1, 4, 24, 27 and 28 to the Plaintiff's Memorandum Brief in Opposition to Summary Judgment. The identified exhibits are two articles and declarations or affidavits.   The Defendants contend that the court ought not consider these materials because they have not been produced to the Defendants.

Callwood argues that Exhibit 1 is an authoritative treatise and does not have to be produced as Callwood does not intend to offer it as an exhibit at trial. Exhibit 28 is an article which Callwood contends is offered in rebuttal to one of the Defendants' arguments and this article was cited by Callwood's expert, Dr. Gowitt, in his Rule 26 Report disclosed to the Defendants. As to the affidavit of Callwood's experts Michael Leonesio (Doc. #106-24) and Gerald T. Gowitt (Doc. #106-27), Callwood responds that she complied with the deadline to designate these experts, and that these supplemental affidavits comport with the disclosure requirement of Rule 26. Callwood states that as to the Affidavit of Michael Brave, Exhibit 4, (Doc. #106-4) she was not required to disclose the affidavit because she does not intend to offer

it at trial.

Based upon the submissions of the parties, it does not appear to the court that the exhibits are due to be excluded for violation of Rule 26. Even if Callwood did not meet her obligations under Rule 26, there has not been a sufficient showing of harm to exclude them under Rule 37 (c)(1) of the Fed. R. of Civil Procedure. Therefore, the Motion to Strike is due to be DENIED.

## Callwood's Federal Claims

Callwood argues that the law enforcement officials involved in the events at issue used excessive and unreasonable force in violation of Illidge's Fourth Amendment rights.   From a review of the evidence presented, it appears that Callwood's claims are brought in the context of three different points in the encounter between Illidge and law enforcement officials: the first is the beginning of the events in question when Mills was alone with Illidge and used a Taser; the second is Ray Smith's use of a Taser, which gives rise to claims against both Ray Smith for using the Taser and against other officers for not stopping Ray Smith's use of the Taser; and the third is the use of restraints combined with the body weight of various officers to secure Illidge. Claims brought against Sheriff Jay Jones in his individual capacity and the City of Phenix City also arise from these actions. The court will, therefore, analyze the claims against all of the Defendants involved in each of the three challenged points of encounter between Illidge and the Defendants. Because all of the individual Defendants have asserted the defense of qualified immunity, the court will analyze the claims against the individual Defendants within the framework of qualified immunity analysis.

### A. Qualified Immunity Analysis

Qualified immunity is a protection designed to allow government officials to avoid the

expense and disruption of trial. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir.1991).   As a

preliminary matter, the court must determine whether the public official was acting within the

scope of his discretionary authority at the time the allegedly wrongful acts occurred.   *See Rich v.

Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).   Once it is established that a defendant was acting

within his discretionary authority, the court must determine whether "[t]aken in a light most

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated

a constitutional right?"   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   "[I]f a constitutional right

would have been violated under the plaintiff's version of the facts," the court must then

determine "whether the right was clearly established." *Wood v. Kesler*   323 F.3d 872, 878 (11th

Cir. 2003).

Requiring that a constitutional right be clearly established means that liability only

attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official

would understand that what he is doing violates that right."   *United States v. Lanier*, 520 U.S.

259, 270 (1997).   In other words, a defendant is entitled to "fair warning" that his conduct

deprived his victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In *Vinyard v. Wilson*, 311 F.3d 1340, 1350-53 (11th Cir. 2002), the Eleventh Circuit

articulated three ways in which individual state defendants can receive "fair notice" that their

conduct violates clearly established law.   First, the words of a federal statute or constitutional

provision may be specific enough "to establish clearly the law applicable to particular conduct

and circumstances and to overcome qualified immunity, *even in the total absence of case law*."

*Id.* at 1350 (emphasis in original).   The Eleventh Circuit considers a case falling into this

category an "obvious clarity case."   *Id.* at 1350.

Second, if the conduct at issue is not so egregious as to violate the Constitution or a federal statue on its face, the court must turn its attention to case law that espouses "broad statements of principle . . . that are not tied to particularized facts." *Id.* at 1351. In these types of cases, courts will declare "X Conduct" unconstitutional regardless of the specific factual situation. *Id.* "[P]ut differently, the precise facts surrounding 'X Conduct' are immaterial to the violation," thus these decisions can "clearly establish law applicable in the future to different sets of detailed facts." *Id.*

Third, courts must look to cases that tie a particular type of conduct to the specific facts of the case. *Id.* With these cases, courts must examine case law stating that "Y Conduct" is unconstitutional in "Z circumstances." *Id.* If the circumstances facing the official are "materially similar" to those of the fact-specific case, this precedent can clearly establish the applicable law and qualified immunity will not be warranted. *Id.* at 1352.

In this circuit, the law can be "clearly established" for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose. *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003).

Once a determination is made that the official was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred, a court can exercise its discretion to determine which prong of the inquiry to address first. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).

There is apparently no dispute that the individual officers were acting within their discretionary authority in this case. Therefore, the court turns to the issue of whether there is

sufficient evidence to create a question of fact as to whether the officers violated clearly established law.

B.   Claim Arising from Initial Use of Taser by Lee County Sheriff Deputy Steven M. Mills[5]

The Fourth Amendment's freedom from unreasonable seizures encompasses the right to be free from excessive force during the course of criminal apprehension. *Graham v. Connor*, 490 U.S. 386 (1989); *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).   Excessive force is measured by an objective reasonableness standard which balances the nature and quality of the intrusion on Fourth Amendment interests against the government interest at stake. *Oliver*, 586 F.2d at 905.   Reasonableness is measured from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and takes into account the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id.*   Other factors to consider may include the need for application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted. *Lee v. Ferraro*, 284 F.3d 1188, 1198 & n.7 (11th Cir. 2002).

It is undisputed that Mills used a Taser on Illidge while he was alone with Illidge at 1920 Pierce Road.   Mills argues that Illidge had engaged in criminal activity, as evidenced by the second dispatch call, Illidge did not respond to Mills' commands, Mills told Illidge he would use

---

[5] Callwood brings claims against Mills for unlawful use of force and failure to intervene. The unlawful use of force claim based on Mills' use of a Taser will be addressed at this point in the discussion, and the failure to intervene claim will be discussed in connection with the discussion of the claims based on the use of a Taser by Defendant Ray Smith.

the Taser and used it when Illidge entered into his zone of safety. He explains that he then used the Taser multiple times because the initial use of the Taser did not cause Illidge to fall, but instead he kept walking and then turned toward the porch of the house. (Doc. #81-1 at ¶6). Mills used the Taser in drive stun mode and Illidge fell to the ground. (Doc. #81-1 at ¶6). Mills stated in his affidavit that Illidge overpowered him and was able to lift up off the ground with Mills on him, so he struck Illidge with the Taser additional times. Mills also states that Illidge grabbed him and slung him at least 10 feet. (Doc. #81-1 at ¶9).

Callwood addresses Mills' evidence and states that some of the facts Mills relies on are disputed. Regarding the statement in Mills' affidavit that Illidge entered Mills' zone of safety, Callwood merely states in her brief that no evidence other than Mills' testimony supports the statement. While the court is required to accept the non-movant's evidence, and draw all reasonable inferences in favor of the non-movant, where Mills has offered affidavit testimony that is not refuted by other evidence, Callwood merely pointing out that there is no other evidence on that point is not sufficient to call that evidence into question. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Callwood also cites to Mills' deposition testimony for the proposition that Mills did not recall being struck by Illidge's hands, but that does not contradict his other deposition testimony that Illidge moved him "as if he was not there" and "threw me around, but not punched me." (Doc. #106-13 at p.168:3-13).

Callwood argues that Illidge was non-violent, exhibiting symptoms of a medical condition of Excited Delirium, and that the multiple uses of the Taser by Mills were unconstitutionally excessive. While Callwood places significance on the fact that Illidge was showing signs of Excited Delirium, this court is persuaded by the reasoning of opinions from

17

other circuits, albeit unpublished, that because there are no Supreme Court decisions which require officers to refrain from force when dealing with an impaired individual, force used under those circumstances can be appropriate. *See Waters v. Coleman*, 632 F. App'x 431, 437 (10th Cir. 2015); *Batiste v. Theriot*, 458 F. App'x 351, 355 (5th Cir. 2012) (stating "Plaintiffs claim that the officers should have recognized that Pierre was in a state of 'excited delirium.' But such recognition would not make their use of the Taser any less reasonable under the test for excessive force."). The court, therefore, turns to the application of case law to the unrefuted facts regarding Mills' use of a Taser against Illidge.

Callwood cites the court to *Lee*, 284 F.3d at 1198. *Lee* is not a case involving the use of a Taser, but is a case which stands for the proposition that force used after effecting an arrest where the person arrested was "fully secured" and poses "no threat at all to the officer or anyone else and no risk of flight" is excessive force. *Id.* at 1198. Cases analyzing the use of force in the form of a Taser have applied this principle. *See Oliver*, 586 F.3d at 905.

Callwood has argued that *Oliver* applies in this case because, even if Mills' initial use of the Taser was reasonable, Mills' use which continued past the initial use constituted an unconstitutional use of force.

In *Oliver*, an officer talked to a person who flagged her down in a road median and told her that people were shooting at him. The suspect struggled to free himself from a second officer, and the first officer used her Taser. The first use of the Taser dropped the suspect to the ground. The officer then proceeded to use her Taser multiple additional times even though the defendant was not accused of any crime, was not threatened with arrest, "posed no immediate threat of danger to officers," "did not behave belligerently," was largely compliant, and "did not pose a

18

grave danger to others." 586 F.3d at 906. The court reasoned that when the defendant was

tasered once by the officer after he struggled to resist another officer, the force may have been

justified to calm him, but the repeated tasering "into and beyond his complete physical

capitulation was grossly disproportionate to any threat posed and unreasonable under the

circumstances." *Id.* at 907.

An Eleventh Circuit case subsequently applying *Oliver* held that an officer committed a

constitutional violation where she failed to intervene when another officer repeatedly discharged

his Taser into a suspect who had been handcuffed. *Salvato v. Miley*, 790 F.3d 1286, 1290 (11th

Cir. 2015); *see also Patrick v. City of Birmingham*, No. 2:09-CV-1825-VEH, 2012 WL 3775865,

at *12 (N.D. Ala. Aug. 29, 2012) (stating that in that case "similar to *Oliver*, that the Officer

Defendants' firing the Taser on Mr. Patrick multiple times (eighteen shots over a period of less

than eleven minutes), given his non-threatening behavior and at best only passive efforts at

resistance, coupled with the known risks associated with using a TASER when a person shows

signs of excited delirium or sudden death syndrome (which Mr. Patrick was undisputably

exhibiting)" was a constitutional violation).

The Eleventh Circuit decided another case of use of force through a Taser after the

parties' briefing in this case. *See Wate v. Kubler*, __ F.3d __, 2016 WL 5929633 (11th Cir. Oct.

12, 2016). In *Wate*, an officer confronted a suspect in a body of water whom he thought he had

probable cause to arrest for battery. A struggle ensued, and the officer placed one handcuff on

the suspect, and as they continued to struggle, the officer began hitting the suspect and dragged

him out of the water. The suspect then lay on the beach but the officer could not get the other

handcuff on him because the suspect was resisting arrest.   The officer got on top of the suspect

and hit him. Others assisted the officer in placing the handcuff on the other arm by holding his

legs, and the suspect continued to resist. The handcuff was placed in an usual manner, and fluid

came out of the suspect's mouth as he struggled to breathe. The officer sat on the suspect as he

continued to resist, used pepper spray, and hit him in the face. A second officer arrived and the

first officer continued to hit the suspect while the second officer put his foot on him.   A witness

stated that the suspect was immobilized. The suspect continued to resist, the second officer gave

him a warning and then deployed his Taser. The officer used his Taser a total of five times over a

two-minute period. The suspect stopped breathing and later died. The court considered claims of

excessive force against the second officer, the officer using the Taser. The court explained that

the eyewitness' accounts varied, but that several witnesses stated that the suspect had stopped

resisting during the two minutes in which the Taser was used. The court held that "while the first

or maybe even the second Taser deployment may have been warranted," by the third tasing, the

suspect was "handcuffed, immobile, and still," and there was a constitutional violation. 2016 WL

5929633, at *6.

By contrast, in *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004), a single use of

a Taser was held to not be an unconstitutional use of force where the person stopped in a traffic

stop was hostile, belligerent, and uncooperative, and the Taser was used before handcuffs were

applied.

In an unpublished decision, relied on by the Defendants, the Eleventh Circuit concluded

that there was no constitutional violation where a plaintiff secured in handcuffs was tased by an

officer. *Buckley v. Haddock*, 292 Fed. App'x 791 (2008). In *Buckley*, a lone officer stopped the

plaintiff for a traffic violation at night. The plaintiff refused to sign the citation, and allowed

himself to be handcuffed, but then dropped to the ground and refused the officer's commands to get up and to the patrol car. The officer warned him that the Taser would be used, and used the Taser three times. The court found it significant in concluding that there was no constitutional violation that the plaintiff was not bound at the feet so still had the ability to run and kick, was moving on the ground beside a busy road, and would not move to the patrol car. *Id.* at 795.

Similarly, in *Mann v. Taser Internat'l, Inc*., 588 F.3d 1291, 1306 (2009), a suspect violently resisted arrest even after being placed in leg shackles so that she was "a danger to herself and others" and the use of the Taser was held to be "appropriate given the countervailing government interest of safety and compliance."

It appears from these cases that use of a Taser is unreasonable where a Taser is used after the suspect was handcuffed, *see, e.g*., *Wate*, 2016 WL 5929633, at *6, and *Salvato*, 790 F.3d at 1295; limp and immobilized, *Oliver*, 586 F.3d at 908; or the suspect is not "argumentative, aggressive, or mobile" *Boynton*, 650 F. App'x at 661, but is reasonable if the person is belligerent and uncooperative and not in handcuffs, *Draper*, 369 F.3d at 1278; not "fully secured," even if handcuffed, *Buckley*, 292 F. App'x at 795; or even if shackled with leg irons, *Mann*, 588 F.2d at 1300.

The evidence in this case is that Mills had been dispatched to look for a naked man, whom he later learned was Illidge, after two calls were made to 911 about Illidge running down the road and being found at a residence. When Mills found Illidge walking down the road, he exhibited signs of Excited Delirium and he did not comply with Mills' directions, but first walked away from him, and eventually entered Mills' zone of safety.

After the initial use of the Taser, while Mills was still alone with Illidge in the dark,

Illidge did not drop to the ground, but continued walking toward a home, and once the Taser was used again, even though Illidge did drop to the ground, he actively resisted arrest and eventually threw Mills to the side. There is no evidence that at any point during this encounter Illidge was Tased while handcuffed, immobile and still, or otherwise fully-secured.

Mills' actions, therefore, are distinct from those in *Oliver*, and the cases discussed. Unlike the detained person in *Oliver*, Illidge was suspected of at least the crime of trespass, he had been threatened with apprehension, was not compliant at the time of the initial use of the Taser, and had entered Mills' zone of safety, making the initial, single use of the Taser a reasonable use of force. *See Draper*, 369 F.3d at 1278. After the initial use, Illidge moved toward a home, did not comply with Mills' directions, and during the use of the Taser actively and effectively resisted arrest. Considering these facts established by the evidence in light of all of the relevant analytical factors as applied by the Eleventh Circuit in the cases discussed, and particularly considering that Illidge was never fully-secured, handcuffed, or compliant, the court concludes that the four additional uses of a Taser by Mills were not constitutionally excessive.

Even if Mills' actions violated the constitution, however, the Eleventh Circuit has clarified that continued resistance to arrest removes a case from obvious clarity qualified immunity analysis. *See Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012). In *Hoyt*, the Eleventh Circuit distinguished *Oliver* in conducting a qualified immunity inquiry, reasoning that in *Oliver* the suspect was not accused of a crime, was not belligerent, and the officer used a probe-style Taser repeatedly even after the suspect had gone limp and was immobilized, whereas the facts in *Hoyt* were that the plaintiff had just committed assault and battery on a police officer, the suspect threatened the officer and had only one handcuff on and tried to prevent being handcuffed, and

the officers even "after repeatedly using their TASERs" in dry stun mode, had difficulty in effecting the arrest. *Id.* at 979-80. The court held that the conduct at issue did not rise to the level of obvious clarity and that the officers were entitled to qualified immunity. *Id.*

As the *Oliver* court explained in denying qualified immunity in that case, there was a violation of clearly established law under the facts in *Oliver* because the need for force was exceedingly limited, and Tasering the suspect at least eight, and as many as eleven or twelve times, in over a two-minute span without attempting to arrest or otherwise subdue the plaintiff, was so disproportionate that no reasonable officer could have thought the amount of force was legal under the circumstances. *Oliver,* 586 F.3d at 908; *see also Wate*, 2016 WL 5929633, at *7 (under *Oliver* an officer is not entitled to qualified immunity if the officer repeatedly tased someone who is handcuffed and had ceased struggling and resisting).

The facts of Mills' use of the Taser are so distinct from those in *Oliver*[6] that, under *Hoyt*, even if Mills' actions constituted a constitutional violation, the court cannot conclude that they were a violation of clearly established law, in light of Eleventh Circuit precedent, and concludes that Mills is entitled to qualified immunity. Summary judgment, therefore, is due to be GRANTED as to the excessive force claim against Mills.

C.   Claims Arising Out of the Use of a TASER by Lee County Deputy Sheriff Ray Smith

1.   Excessive Force Claim Against Ray Smith

Ray Smith is the second Lee County deputy who used a Taser during the arrest of Illidge.

---

6 *Wate, Salvato* and *Patrick* could not clearly establish the law at the time of Mills' actions because *Wate* and *Salvato* were decided after the events in question, and *Patrick* is a district court decision. *See Hoyt v. Cooks*, 672 F.3d 972, 978 (11th Cir. 2012)

The evidence, as set out above, is that Ray Smith joined Mills in a pursuit of Illidge to the patio outside of the Warrs' home. Some of the events in question were witnessed by Gloria Warr, but she did not witness the use of the Taser. Illidge tried to enter the home, was instructed by officers to get down on the ground and to stop, but instead Illidge moved rapidly toward the officers. Ray Smith used his Taser and struck Illidge with one probe in Illidge's chest and one below his waist. (Doc. #81-2 at ¶7). Illidge fell to the ground on his stomach. Mills and Phenix City Police Officer David Butler ("Butler") then attempted to secure Illidge in handcuffs.

The Defendants cite Smith, Butler, and Mills's Affidavits in which they state that Illidge resisted while Butler and Mills attempted to put the handcuffs on. (Doc. #81-2 at ¶7, 81-5 at ¶5, 81-1 at ¶12). Butler explained that after Illidge hit the ground, he struggled and resisted and they instructed him to calm down, but he did not cooperate, and that they struggled with him for several minutes before Mills was able to get a handcuff on Illidge's left hand. (Doc. #81-5 at ¶ 6). It is undisputed that Ray Smith deployed the Taser several times while Mills and Butler were trying to handcuff Illidge. Smith states that he put down the Taser to assist Mills and Butler in securing the handcuffs. Even after the handcuffs were applied, Illidge continued to struggle.

The Defendants have taken the position that Ray Smith discharged his Taser while handcuffs the officers attempted to apply both handcuffs and then Ray Smith put the Taser aside and helped Mills and Butler handcuff Illidge. (Doc. #80 at p.49).

Callwood contends that Ray Smith used the Taser on Illidge without justification. In so-arguing, she disputes in her brief evidence relied upon by the Defendants. One such dispute apparently is the circumstances under which Ray Smith first used the Taser. Callwood argues in her brief that Illidge turned from the Warrs' house and walked toward Mills and Ray Smith

because they commanded him to, citing Mills' deposition at page 200:10-13.[7]  That testimony by

Mills, however, is as follows: "Q. Okay. What was the next thing that you remember happening?

A. As he was coming towards me, I remember Deputy Smith discharged or used his Taser."

(Doc. #134-1). This evidence, therefore, does not call into question the affidavit evidence and

deposition testimony that Illidge was instructed to get down on the ground and to stop. There is

no evidence from which a reasonable inference can be drawn that in moving toward the officers

at that point, Illidge was complying with a command of the officers. *Avenue CLO Fund, Ltd. v.*

*Bank of America, N.A.*, 723 F.3d 1287, 1294 (11th Cir.2013) ("All reasonable inferences arising

from the undisputed facts should be made in favor of the nonmovant, but an inference based on

speculation and conjecture is not reasonable.").

At some points in her argument, Callwood states that there is evidence that Ray Smith

continuously discharged the Taser while Illidge was being handcuffed, and while as many as six

officers were applying restraints and body weight to him. (Doc. #112-1 at p.56, 87).   It is

unclear whether Callwood is contending that there is evidence that Illidge was tased while he

was handcuffed and being held by six officers, or that there is evidence that he was being tased

only before the handcuffs were applied. If Callwood is taking the former position, any evidence

creating a dispute of fact on that issue is significant in light of the case law addressed above

which places great significance on whether a person was fully-secured at the time force was

used. *See Wate v. Kubler*, _ F.3d _, 2016 WL 5929633, at *4–5 (11th Cir. Oct. 12, 2016).

Therefore, the court will first address the evidence regarding the relevant sequence of events.

---

[7] Callwood cites page 200 of Exhibit 13. Page 200 is located in her Corrected Evidentiary
Submissions. (Doc. #144-13).

For evidence on the timing of the use of the Taser, Callwood cites to testimony by Butler. Butler's testimony was fully set out above, but in summary, Butler was asked whether Ray Smith was controlling the Taser, to which he answered, "If he needed it, but I'm not sure how the whole Taser works." Then he answered, "Correct," when asked, "Okay. But you know that Deputy Smith is holding the Taser, you and Corporal Mills are on each side of his body trying to get an arm?" (Doc. #106-15 at p.51:22-52-18). Butler's only reference to the Taser, therefore, does not support a reasonable inference that Ray Smith used the Taser after both of Illidge's arms were secured in handcuffs, or that the Taser was being used after other officers arrived on the scene. Additionally, Ray Smith has provided affirmative affidavit evidence to the contrary, specifically, his statement in an affidavit that once he "put down the Taser to assist in handcuffing him, [he] did not tase him again." (Doc. #81-2 at ¶8).

In apparent recognition that the unrefuted evidence only supports that the Taser was used before Illidge was fully handcuffed, but not after that, in the argument section of her brief regarding the claims against Ray Smith, Callwood argues that after the first use of the Taser by Ray Smith, because Illidge fell to the ground, Mills and Butler had the opportunity to handcuff Illidge, which they did. (Doc. #112-1 at p.103). She states that Illidge was tased after he was "face down on the ground and being placed in handcuffs." (Doc. #112-1 at p.103). Because the evidence supports the theory that the Taser was used while Illidge was in the process of being handcuffed, the court will turn now to Callwood's argument that the use of the Taser by Ray Smith while Illidge was being placed in handcuffs was so excessive that it constituted unreasonable use of force in violation of clearly-established law.

As noted earlier, a court must examine "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balanc[ing] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). "Although some amount of force is generally needed to subdue a suspect, the amount used must be reasonably proportionate to the need for force." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Wate*, 2016 WL 5929633, at *4–5.

Callwood cites to Butler's deposition for the proposition that after a Taser is used, officers use other methods of hands-on restraint. Callwood has provided evidence that after a suspect has fallen to the ground, the Taser has done its job, and once the officers have begun to apply restraints, the only use for a Taser would be to apply pain. The training provided by the Taser company, or by law enforcement, in the use of a Taser, however, does not set the constitutional standard. *See Boynton v. City of Tallahassee*, 650 F. App'x 654, 660 (11th Cir. 2016) (stating that a use of force policy regarding use of a Taser "does not guide our analysis— the Fourth Amendment does.").

To support the argument that Smith's conduct violated Fourth Amendment constitutional standards, Callwood primarily relies on *Oliver*, a case in which, as earlier noted, the officer tased the suspect multiple times and the court reasoned that while the first use of the Taser may have been reasonable, the additional eight to eleven or twelve uses of the Taser were not. 586 F.3d at

908. Significant to the court's reasoning in finding a constitutional violation, however, was that the plaintiff was not suspected of any crime, did not act belligerently or aggressively, complied with most of the officer's directions, and made no effort to flee, and yet the officer used the Taser repeatedly "without attempting to arrest or otherwise subdue the plaintiff."   *Id*.

     *Oliver*, therefore, is distinct from the facts in this case in significant ways, such as that Illidge had previously used force to get away from Mills, had attempted to enter the Warrs' home, did not comply with commands and moved rapidly toward the officers before the first use of the Taser, making that initial use a reasonable use of force, and then Illidge actively resisted the officers while they were attempting to handcuff him after the initial use of the Taser. While the Taser was being used, Illidge was not handcuffed, fully-secured, subdued, compliant, or immobile. As stated by the court in *Wate*, the Eleventh Circuit has held that

> noncompliance or continued physical resistance to arrest justifies the use of force by a law enforcement officer. *See Draper*, 369 F.3d at 1278 (holding that the use of Taser to effectuate an arrest did not constitute excessive force when the suspect repeatedly refused to comply with the officer's verbal commands). However, "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330; *see also Lee*, 284 F.3d at 1200 (holding that once an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ severe and unnecessary force).

*Wate*, 2016 WL 5929633 at *5. Also as noted in *Wate*, even if this court expands the scope of clearly established law to consider all cases of use of force against persons who have been arrested, and does not limit the clearly-established inquiry to cases in which force was used in the form of a Taser, the general proposition of law expressed in *Lee*, 284 F.3d at 1198, is that "[o]nce an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose." *See also Buckley*, 292 F. App'x at 798 ("At best, *Lee* decides only that no officer can use force against an arrestee who is already handcuffed and who is resisting

arrest in no way.").

Because the unrefuted evidence in this case establishes that the Taser was not used after the handcuffs were applied, and that Illidge was actively resisting arrest at the time the Taser was used, "the facts in *Oliver* are so different from the instant facts that the obvious clarity holding in *Oliver* falls short of indicating obvious clarity in this case." *Hoyt*, 672 F.3d at 980.

In fact, this case is more analogous to *Hoyt,* where qualified immunity was granted, than to *Oliver*. In *Hoyt*, an officer responded to dispatch calls and found a man in distress, claiming that demons were trying to get him. The officer ordered the man to put his hands behind his back, but he did not comply and resisted the efforts of the officer and the officer's back-up to apply handcuffs. The officer used his Taser once using the probes, and again in dry stun mode, but the man still refused to be handcuffed. The Taser was used several additional times and the second law enforcement representative used his Taser as well. The officers then stopped using the Tasers and handcuffed the man using physical force. The evidence showed that one Taser was activated twelve times and the other six, but only once in the prong mode. *Hoyt*, 672 F.3d at 976.   In reversing the district court and granting qualified immunity, the court reasoned the man had committed assault and battery on the officer by lunging at him and threatening to kill him, the suspect posed a danger when only one of his hands was handcuffed, the man resisted arrest the entire time, and the Taser was used in the less- serious dry stun mode. *Id.* at 979-80.

The court is aware that there is evidence in this case that a Taser is not designed to be used as many times as Smith used the TASER on Illidge. And, the evidence before the court is that Ray Smith deployed the Taser in prong mode, distinguishing that factor of analysis in *Hoyt*. The law of the circuit, however, is clear that resistance to arrest is a significant factor in the

analysis and there is unrefuted evidence that Illidge was actively resisting arrest while the Taser was being used. It may be that at some point the law will become clearly-established that there is a threshold number of times a Taser can be deployed, or deployed in a certain mode, before excessive force will be found even though the suspect is not fully-secured and continues to resist arrest, but that case law does not yet exist in the precedent which can clearly-establish law in the Eleventh Circuit. *See Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003). Under Eleventh Circuit precedent, the repeated use of a Taser after an initial reasonable use is unconstitutional if it occurs after a suspect is fully-secured and has ceased resisting arrest. The facts of this case do not fall within that existing case law and, as stated in *Hoyt*, 672 F.3d at 978, also fall outside of the obvious clarity analysis of *Oliver*. Therefore, Ray Smith is entitled to qualified immunity, and summary judgment is due to be GRANTED on that basis.

2. Claims for Failure to Intervene Brought Against Lee County Sheriff Deputies Charles Jenkins, Jr. and Mills and Phenix City Officers Williams, Sheely, and Butler

Callwood has brought a claim against individual officers on the basis that Defendants Jenkins, Mills, Williams, Sheely, and Butler were present when Ray Smith tased Illidge fourteen times and that they failed to intervene. Callwood cites the court to *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007), in which an officer was held liable for failure to intervene in an excessive use of force. Callwood claims that Ray Smith used a Taser in the presence of Mills, Williams, Jenkins, Butler, and Sheely, relying on Ray Smith's deposition testimony. Ray Smith acknowledged in his deposition testimony that he used the Taser, but he does not state on that page of his testimony that any officer witnessed the use of the Taser. (Doc. #144-14 at p.72:11-18).

Jenkins states in his affidavit that a Taser was not used on Illidge in his presence. (Doc. #77-10).   Jenkins states that he did not arrive on the scene until after Illidge was in handcuffs. Similarly, Sheely states in his affidavit that he did not witness any use of a Taser. Williams also arrived on the scene after the handcuffs had been applied. (Doc. #77-3).

Callwood does not point to any evidence to call into question the evidence that Jenkins Williams, and Sheely arrived on the scene after Illidge was handcuffed, and, as the evidence presented establishes, use of the Taser had ended. There is no evidence to refute the affirmative evidence that Jenkins, Sheely, and Williams did not witness the use of a Taser. To establish a constitutional violation based on a failure to intervene, a plaintiff must show that the police officer witnessed the excessive use of force and was in a position to intervene. *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir.2000). Summary judgment is due to be GRANTED as to the claim against Jenkins, Williams, and Sheely for failure to intervene with the use of the Taser.

The inquiry is somewhat different with respect to Mills and Butler because they were attempting to secure handcuffs on Illidge while Ray Smith used the Taser. Mills states in an affidavit that he and Butler were able to put handcuffs on Illidge, but that did not stop Illidge from resisting, and that he did not know if Smith used his Taser during that struggle. (Doc. #81-1 at ¶12). Butler has provided evidence that he only witnessed Ray Smith use the Taser once, and that if Ray Smith used the Taser more than once, he was unaware of that because Illidge continued to struggle. There is, however, also Butler's testimony that he knew Ray Smith was holding the Taser which, when viewed in a light most favorable to the non-movant, might allow for the reasonable inference that Butler witnessed Ray Smith's continued use of the Taser.

In the Eleventh Circuit, a police officer has an obligation to intervene to prevent or stop the use of excessive force when he witnesses it and is a position to intervene. *Priester*, 208 F.3d at 927.   Viewing all evidence in the light most favorable to the non-movant, there may be sufficient evidence to show that Butler at least was aware of the use of the Taser. The court must conclude, however, that both Mills and Butler are entitled to qualified immunity because it is not clearly established that the failure to intervene in Ray Smith's use of the Taser was a constitutional violation under the circumstances.

That a police officer had a duty to intervene when he witnesses the use of excessive force and had the ability to intervene is clearly established.   *Id.* The Eleventh Circuit explained in *Priester* that because the excessive force in that case was obvious and was such that every reasonable officer would have known that it was clearly in violation of the plaintiff's constitutional rights and the officer had the time and ability to intervene, but did nothing, he was not entitled to qualified immunity. *Id.* In the instant case, for the reasons discussed above, this court cannot reach the conclusion under existing Eleventh Circuit precedent that Ray Smith's actions violated clearly-established law. Therefore, the court similarly must conclude that because under the circumstances of this case, the use of the Taser did not violate clearly-established law, the failure to stop the use of the Taser also did not violate clearly-established law. *See Jones v. Cannon,* 174 F.3d 1271, 1286 (11th Cir. 1999) (stating no previous decision from the Supreme Court or this Circuit holding that an officer has a duty to intervene and is therefore liable under the circumstances presented); *Rudolph ex rel. Williams v. Lowndes Cty. Bd. of Educ.*, 242 F. Supp. 2d 1107, 1123 (M.D. Ala. 2003) (finding that even assuming there was an excessive use of force, under these facts of the case, the officer charged with failing to

intervene would not have had fair warning that his failure to intervene was a constitutional violation). Summary judgment is due to be GRANTED as to the claims based on a failure to intervene in Ray Smith's use of a Taser.

C.   Lee County Sheriff Jay Jones

The claim against Jay Jones is a claim against him in his individual capacity based on his failure to train Lee County Sheriff deputies.

Supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. *Mann v. TASER Int'l, Inc*., 588 F.3d 1291, 1308 (11th Cir. 2009). The central tenet for both theories is a constitutional violation. *Id.*

To the extent, therefore, that Mills, Smith, or other officers did not violate the constitution in the use of, or lack of intervention in the use of a TASER in this case, the claim against Jones under a theory of supervisory liability fails. *Id.*

To the extent that there is a constitutional violation, the standard for the imposition of liability upon a supervisor defendant who was not present when the constitutional violation occurred is "extremely rigorous." *Braddy v. Florida Dept. of Labor and Employment Sec*., 133 F.3d 797, 802 (11th Cir.1998).   The necessary "causal connection" "can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, or when the supervisor's improper custom or policy resulted in deliberate indifference to constitutional rights." *Gonzalez v. Reno*, 325 F.3d 1228, 1234–35 (11th Cir.2003) (internal quotations omitted).

Callwood argues that Sheriff Jones can be held liable on a supervisory liability theory because he knew that the Lee County Sheriff Deputies utilized Tasers by striking individuals in the chest with the Taser and tased individuals multiple times, outside of the training guidelines from the Taser company, but he did not discipline his deputies for doing that, or failed to properly train them to use Tasers the recommended number of times. Callwood argues that if Lee County Defendants Mills, Ray Smith, and Jenkins had been properly trained in the warnings and guidelines of Tasers, or had been counseled on the proper use when another officer used it improperly, Illidge would not have had his constitutional rights violated.   In support of her argument, Callwood provides the court with one hundred and twenty-four pages of Alabama Uniform Incident/Offense Reports, without citing to any particular part of any report.

Upon review of the voluminous exhibit, the court finds some references to use of a Taser striking the chest area of a person arrested, but also finds reports which do not mention any of the deficiencies outlined in Callwood's brief. Significantly, there is no evidence before the court to establish that any of the reports concerned a misuse of a Taser which rose to the level of a constitutional violation.

Jones states in an affidavit there is a certification program in place that requires taking a specific number of classroom hours, a written exam, and a practical exam, and annual recertification. He argues that Callwood has failed to provide evidence of obvious, flagrant, and rampant deprivations that constitute widespread abuse sufficient to notify the supervising official, citing *Keith v. DeKalb C'nty., Ga.*, 749 F.3d 1034, 1048 (11th Cir. 2014). Jones also argues that he is entitled to qualified immunity under *Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008).

34

The court agrees that Callwood has failed to establish a "history of widespread abuse." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Callwood's evidence, even assuming it supports her characterization of documenting Taser use which does not comply with Taser company guidelines, does not establish widespread constitutional violations sufficient to establish supervisory liability. Even if Jones could be held liable for a constitutional violation based on this evidence, he is entitled to qualified immunity because there is no clearly-established law that violation of Taser-use guidelines is synonymous with a constitutional violation. *Cf. Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir. 2004) (no constitutional violation where officer discharged a Taser gun at the suspect's chest).

   D.   Claims Based on the Use of Restraints and Body Weight in Securing Illidge

Callwood also brings claims against officers involved in the application of their body weight while using physical restraints on Illidge. As the Defendants point out, the claim in Count III of the Amended Complaint is a claim for failure to intervene when multiple officers piled on top of Illidge, but the evidence does not support an allegation that multiple officers piled on top of Illidge. Since the time of her Amended Complaint, however, Callwood has refined her theory of excessive force, arguing that Butler, Jenkins, Williams, Ray Smith, and Sheely placed weight on Illidge's back and legs, pinning him to the ground and impairing his ability to breathe, and that this use of force, combined with devices to restrain Illidge in a hog-tie position contributed to his death. Callwood also faults them for not providing water to Illidge. It is somewhat unclear, but Callwood appears to argue that all of the officers' actions together were an unconstitutional use of force, and that each of the officers' individual actions were a constitutional violation for

35

failure to intervene in the others' actions. Callwood particularly focuses on actions by Williams, pointing out that Williams weighed 385 pounds and arguing that he placed his full body weight on the upper and mid-back of Illidge while Illidge was handcuffed, shackled, and hog-tied, and other officers were also restraining him.

In support of these claims, Callwood argues that a gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force, citing cases such as *Lee*, 284 F.3d at 1200.

The Defendants argue that Illidge had attempted to enter the Warrs' residence and actively resisted arrest and attempted to evade arrest by flight so that the application of force was necessary.

The evidence Williams presents is his affidavit in which he states that when he arrived on the scene, he noticed a baton through handcuffs used for leverage to maintain control, and he had one knee near Illidge's lower back and one near his shoulder and neck. (Doc. #77-13 at p.4). Williams also states that at no time was his full body weight on Illidge.[8] He states that Illidge was still able to throw the officers and deputies off, and he kicked his legs wildly. (*Id.*). In his deposition, Williams states that while he had handcuffs and leg restraints on, Illidge was still struggling and they were trying to maintain control. (Doc. #134-5 at p.90-1). Williams testified in his deposition that he was not aware that flex cuffs had been applied, but agreed that if flex cuffs had been applied and he had been hobbled in that way, Illidge would not have been able to go anywhere.   (Doc. #134-5 at p.93: 5-13).   Williams testified that if he had been in the

---

[8] Williams states that his feet were on the ground with his toes bent so that his entire body weight had not been placed on Illidge. (Doc. #134 at p. 88).

position, the only reason to continue to apply pressure would be to keep him from hurting himself by thrashing around. (Doc. #134-5 at p.93: 10-19). Williams also presents evidence that while Williams was controlling Illidge's upper body, he was not subdued, but was sliding his knees up, trying to stand up.

Sheely states in his affidavit that when he came upon the scene and saw Williams, Butler, and Mills attempting to restrain Illidge and Williams asked Sheely whether he had any leg irons. Sheely left the scene and talked with a Lee County Deputy about getting some leg irons. When Sheely returned, he helped to hold Illidge's legs. He states that Illidge was able to lift at least three officers off the ground with his body. (Doc. #77-14). He further states that after Illidge was placed in leg irons and stretch cuffs, he was relieved from restraining his legs. When asked why Williams continued to place weight on Illidge, Sheely stated that one purpose for the restraint was to keep Illidge from injuring himself. (Doc. #106-18 at p.78:14-17). Butler also helped to restrain Illidge's legs.

Jenkins states in his affidavit that when he arrived on the scene, Illidge was in handcuffs. Jenkins was asked to retrieve leg irons, and did so. (Doc. #77-10). Gloria Warr described the scene as "very professional," stating that the officers were trying to keep Illidge from hurting himself, one officer was holding Illidge's legs and they were moving, an officer was holding Illidge's back down and they were saying, "Calm down, man." (Doc. #117-4 at p. 96:2-6, 20-97:3). As noted earlier, the court has accepted Gloria Warr's characterization of Illidge's actions after the handcuffs were secured in which she stated that Illidge was still trying to move, the officers were trying to stop him, and he "was just moving, going up the steps." (Doc. #106-23 at p. 52: 14-17).

There is an unpublished Tenth Circuit case which is similar to this case. *See Waters v. Coleman*, 632 F. App'x 431 (10th Cir. 2015).   In *Waters*, a suspect had an altercation with zoo security and the police were called. An officer noticed that the suspect was exhibiting signs of excited delirium. The suspect was tackled and when he violently resisted, the officer punched him and used a Taser in drive stun mode.   A second officer arrived and the first officer used the Taser a second time, and the second officer used his Taser twice. Other officers used leg restraints, and the suspect was also handcuffed. Two people had their knees on the suspect's shoulders when another officer arrived and bent the suspect's legs up and leaned on his legs and remained that way for several minutes. The suspect vomited. Then the suspect stopped breathing and an officer began chest compressions.   The court concluded that the first officer who used the Taser did not act unreasonably in the initial use of force, and that no clearly established law held that an officer must refrain from using force when dealing with an impaired individual. *Id.* at 439.   The court similarly concluded that the second officer's use of force, deploying a Taser while struggling with the suspect with other officers also was not unreasonable because it occurred before the suspect was detained. *Id.* at 439.

The court's analysis was different, however, with regard to the officer who applied his body weight to the suspect's legs.   The court reasoned that if the officer's complained-of force was applied in an effort to control him while he was struggling, the law would not have been clearly established and the officer would have been entitled to qualified immunity. *Id.* at 441. There was a finding in the district court, however, that the officer continued to restrain the suspect's legs while the suspect was in a prone position for several minutes after he was handcuffed, and after the suspect had vomited and showed symptoms of excited delirium, and

38

this finding was one over which the appellate court lacked jurisdiction. The court noted that the district court's findings were analogous to the force considered potentially excessive in precedent where the officers subjected a detainee to force they knew was unnecessary to restrain him. *Id.* at 441-42.

Although this analysis might support the finding of a constitutional violation, individual liability for such a violation is foreclosed by a case which is binding on this court, *Lewis v. City of West Palm Beach, Florida*, 561 F.3d 1288 (11th Cir. 2009).   In *Lewis*, an officer handcuffed a person, Donald Lewis, who appeared to be under the influence of a narcotic and two additional officers bound the person's legs using a leg restraint. Throughout the process of being restrained, Lewis did not respond to "repeated requests to calm down." *Id.* at 1290.   Two additional officers arrived, and one officer suggested attaching the leg or ankle restraint to the handcuffs with a hobble cord. To do this, two officers kept their knees on his back, while another picked up his bound legs and pushed them forward. The hobble was tightened so that Lewis's hands and feet were close together behind his back in a "hog-tie" position. The officers then realized that he had become unconscious. He was later pronounced dead. The district court granted summary judgment to the five officers on the basis of qualified immunity. *Id.*

On appeal, the representative of the decedent Lewis argued that because the officers restrained the decedent with the hobble after the need for any use of force had passed and tightened it to form a hog-tie, the officers' conduct rose to this level of egregiousness.   The Eleventh Circuit disagreed, reasoning that "[e]ven though most of the officers in this case testified that Lewis was not a danger to them and was merely resisting arrest, he was, as the district court described, 'an agitated and uncooperative man with only a tenuous grasp on

39

reality.' Because of his refusal to sit upright and his inability to remain calm, Lewis remained a safety risk to himself and to others." *Id.* at 1292.   The court further explained that this was "precisely the type of situation where the decisions of the officers confronted with 'circumstances that are tense, uncertain, and rapidly evolving' should not be second-guessed." *Id.* (citation omitted).

In affirming the grant of qualified immunity to the officers, the Eleventh Circuit distinguished *Lee*, stating that unlike in that case "Lewis did not remain compliantly restrained," but instead "[e]ven though he was not forcefully attacking the officers, Lewis continued to struggle." *Id.* at 1292. The court concluded by reasoning that "[t]he application of the hobble may not have been entirely necessary; however, the officers' attempts to restrain Lewis were not so violent and harsh to be considered an egregious violation of a constitutional right, and they are not an obstacle to the application of qualified immunity. Despite the unfortunate result that night, qualified immunity insulates the officers from liability for Lewis's death." *Id.; see also Garrett v. Athens-Clark County, Ga.*, 378 F.3d 1274 (11th Cir.2004) (holding that the use of fettering after a suspect had been subdued with pepper spray did not violate the Fourth Amendment rights of a decedent because after using the pepper spray, the "officers took advantage of a window of opportunity—of unknown duration—to restrain Irby in such a way that he could not harm another officer or himself should he decide to stop being compliant, a realistic possibility given his recent words and deeds.").

In this case, of course, Callwood has challenged the application of Williams', and other officers', body weight after application of the flex cuff, handcuffs, and leg restraints, whereas in *Lewis* the Eleventh Circuit focused on the force of the "hog-tie" restraint.   However, the district

court's opinion in *Lewis* makes clear that qualified immunity was granted even though "while the officers bound Lewis in the hobbling device, Officer Root and Officer Luke appeared to both have their knees on Lewis' back. Here again, because Lewis' hands were cuffed behind his back and his feet already tied together, there appears to have been no reason for Officer Root and Officer Luke to employ such a painful and potentially dangerous technique." *Lewis v. City of West Palm Beach*, No. 06-81139-CIV, 2008 WL 763250 (S.D. Fla. March 19, 2008).

The Eleventh Circuit decided *Lewis* in 2009. This court has not been pointed to any Eleventh Circuit cases decided after *Lewis*, but before the events at issue in this case, which would have clearly-established that the officers in the instant case violated Illidge's constitutional rights in applying body weight and restraints under the circumstances presented.

Under the binding precedent of this circuit, the court concludes that qualified immunity is due all of the officers for participating in, and failing to intervene in, *see Jones,* 174 F.3d at 1286, the use of physical restraints and application of body weight during the arrest of Illidge. Summary judgment is, therefore, due to be GRANTED as to the claims based on the use of physical restraints and body weight to restrain Illidge.

E.  City of Phenix City/Chief Raymond Smith in his Official Capacity

The City of Phenix City and Chief Raymond Smith first argue that Raymond Smith is due to be dismissed as a defendant in his official capacity because claims against municipal officers and suits against municipalities are equivalent, citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1991).[9] These Defendants also argue that although they moved for summary judgment

---

[9] The Second Amended Complaint does not name Raymond J. Smith in his official capacity. (Doc. #40).

on a theory, as stated in the Amended Complaint, that there was a failure to train in the use of Tasers, Callwood has abandoned that claim and relies only on a theory that there was a failure to train in the duty to intervene.

Municipal liability under §1983 attaches if there is a policy or custom which is the moving force behind the constitutional violation. *Monell v New York City Dept. of Social Services*, 436 U.S. 658 (1978).   When the policy or custom alleged is a failure to train, a plaintiff must show that the "failure to train reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989),

To determine whether a failure to train amounts to a deliberate or conscious choice by a municipality, courts are instructed to look at the "degree of fault" of a municipality's failure to train and determine whether it "amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388 (emphasis added). With respect to police officer training, the deliberate indifference standard is appropriately a high threshold. *Id.* at 391; *see also Connick v. Thompson*, 563 U.S. 51, 70 (2011). Ordinarily, a plaintiff must allege a pattern of widespread constitutional violations that would put the municipality on notice of its inadequate training. *See Connick*, 563 U.S. at 62.

Callwood argues that Chief Raymond J. Smith has policymaking authority for the Phenix City Police Department and that the City, through Chief Smith, failed to implement any required training concerning mentally ill suspects, leading to a violation of Illidge's constitutional rights, and that there was a failure to train on intervening when a constitutional violation was taking place in their presence.[10]   Callwood cites to *Harrington v. City of Phenix City*, No. 3:10cv1048,

---

[10] Callwood has not responded to evidence in support of summary judgment on a theory of

2012 WL 204168 (M.D. Ala. Jan. 24, 2012), arguing that that case placed the City of Phenix City on notice that it needed a policy regarding a duty to intervene in a constitutional violation.

Upon review of the Second Amended Complaint (Doc. #40), the court agrees with the Defendants that the theories of liability pled were for failure to train in the use of tasers and failure to intervene, and there was no allegation of a failure to train in dealing with mentally ill suspects. Therefore, the court will only address the claim for failure to train to intervene when a constitutional violation is taking place. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998). In *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir.1987), even though there had been ten citizen complaints, the court held that the city did not have any notice of past police misconduct because the plaintiff "never demonstrated that past complaints of police misconduct had any merit." *Id.* at 1193.

The *Harrington* opinion pointed to by Callwood did not make a finding as to a policy or custom based on failure to train, and would only constitute one infraction if it did, not a widespread pattern of abuse. Summary judgment is, therefore, due to be GRANTED as to Raymond Smith in his official capacity, to the extent that such a claim has been brought, and the City of Phenix City.

---

failure to train in the use of Tasers, presumably because the Tasers in this case were used by Lee County Deputies and not Phenix City officers.

**State Law Claims**

The Defendants have moved for summary judgment on the state law claims against them, primarily on the basis of state law immunity issues. Pursuant to 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if [...] the district court has dismissed all claims over which it has original jurisdiction." *See also Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1568–69 (11th Cir.1994) (noting the section and discussing analysis to be used in exercising the court's discretion). Factors to be taken into account include "the values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Courts are strongly encouraged to dismiss state claims when the federal claims have been resolved prior to trial. *See id.; Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). In this case, considering that declining jurisdiction is favored where the federal claims are dismissed prior to trial, and other relevant factors, including that comity is implicated by the issues of state law immunity law to be resolved, the court declines to exercise supplemental jurisdiction over the state law claims.

## V. CONCLUSION

The facts of this case present a tragic situation in which a man suffering from Excited Delirium lost his life in the course of being detained by law enforcement officials. For the reasons discussed, however, the court cannot conclude that the Defendant law enforcement officials of Phenix City and Lee County, Alabama, or the City of Phenix City can be held liable under federal law, because Eleventh Circuit case law on the reasonableness of the use of Tasers and on the reasonableness of the use of body weight and restraints in detaining suspects who

44

resist arrest dictates that conclusion. Callwood is free to file suit on the state law claims in state court within 30 days, as provided in 28 U.S.C. §1367(d).

Accordingly, it is hereby ORDERED as follows:

1. The Motion to Strike Paragraphs 3, 4, and 5 of the Declaration of Gloria Warr (Doc. #111) and the Motion to Strike Portions of Paragraphs of the Affidavit of the Woodhams (Doc. #114) are GRANTED.

2. The Motion to Amend/Correct filed by Callwood (Doc. #112) is GRANTED.

3. The Motion to Strike filed by the Defendants (Doc. #132) is DENIED.

4. The Motion for Summary Judgment filed by Defendants David Butler, Phenix City, Shawn Sheely, Raymond J. Smith, and Joey Williams (Doc. #76) is GRANTED as to the Plaintiff's federal claims and judgment is due to be entered in favor of those Defendants and against the Plaintiff on the federal claims.

5. The Motion for Summary Judgment filed by Charles W. Jenkins Jr., Jay Jones, Steven M. Mills, and Ray Smith (Doc. #79) is GRANTED as to the Plaintiff's federal claims and judgment is due to be entered in favor of those Defendants and against the Plaintiff on the federal claims.

6. Pursuant to 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over the state law claims.

Final Judgment will be entered in accordance with this Memorandum Opinion and Order. Done this 10th day of November, 2016..

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE